[Crim. No. 13657.    Second Dist., Div. Four.    June 19, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. CLARENCE WALBERG et al., Defendants and Appellants.

Kelly, Mann & Hilby, Kelly & Mann, John M. Mann, Masry & David, Edward L. Masry and Ronald M. Cohen for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—A jury found defendant Walberg guilty of 10 counts of selling securities without a permit of the Commissioner of Corporations, in violation of Corporations Code section 26104, subdivision (a).[1] Defendant Davidson was found guilty of nine of these offenses. Proceedings were suspended and each defendant was placed on probation. Each appeals from the order granting probation, which is deemed a judgment for the purpose of appeal.

The essential facts of the case are not in controversy.

Defendant Walberg was the pastor of a church. He was also the founder and president of a nonprofit corporation named Cup of Cold Water Ministry, Inc. (hereinafter called the corporation), which carried on the missionary work of the church. In November 1963 the corporation purchased the Hermosa Beach Biltmore Hotel, and embarked upon a plan to refurbish and rebuild the structure so that it could be used for the corporation's purposes. Defendant Davidson served as secretary-treasurer of the corporation and general manager of the hotel. This seven-story building was then 38 years old and, to quote Davidson, in "terrible" condition. He testified:

"The building had virtually ceased to function. The elevator was inoperable. The boiler system had broken down. There was no heat in the building at the time. There was hot water to one portion of the building. The hallways were littered; the electrical system was in bad repair; the plumbing generally was rather ineffectual.

"The exterior of the building was in a very sad state of repair."

In order to raise funds for this project defendant Walberg solicited loans of money, for which he offered to pay 6 percent interest. From the pulpit of his church he suggested that this was "a wonderful, Christian opportunity" and that people should take their money out of the bank and put it to work. Defendant Walberg spoke on the radio daily in the course of

---

[1]Corporations Code section 26104 then provided:

"Every officer, agent, or employee of any company and every other person, who does any of the following acts is guilty of a public offense punishable by a fine not exceeding five thousand dollars, or by imprisonment in the state prison not exceeding five years or in a county jail not exceeding one year, or by both such fine and imprisonment:

(a) Knowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security, in nonconformity with a permit of the commissioner then in effect authorizing such issue, or contrary to the provisions of this division, or of the Constitution of this state. . . ." (Stats. 1957, ch. 139, p. 736.)

his missionary activities, and on many occasions, in his broadcasts, he asked the people to go to the bank, take their money out, let it work for a Christian use and be paid 6 percent interest. Defendant Walberg also conducted public meetings at the hotel, during which he solicited loans. Printed and mimeographed literature soliciting loans was prepared by defendant Walberg, and mailed to church members and to those of the radio audience who had written in.[2] This literature was also distributed to persons who attended concerts at the hotel, and copies were left in the hotel lobby to be picked up.

Each count upon which defendants were convicted involves a different investor. One investor loaned $5,000 on a 90-day note, bearing interest at the rate of 5 percent per quarter. The other nine investors paid amounts ranging from $500 to $9,000, for which each received a promissory note of the corporation. All except one of the notes bore 6 percent interest and all were payable in one year. Each note was signed by defendant Walberg as president and by defendant Davidson as secretary of the corporation. These transactions occurred between January 1964 and February 1965. None of these investors had been repaid as of the time of the trial. It was stipulated that no permit to issue securities had been obtained from the Commissioner of Corporations.

Corporations Code section 25008 provides:

" 'Security' includes all of the following:

(a) Any stock, including treasury stock; any certificate of interest or participation; any certificate of interest in a profit-sharing agreement; any certificate of interest in an oil, gas, or mining title or lease; any transferable share, investment contract, or beneficial interest in title to property, profits, or earnings.

(b) Any bond; any debenture; any collateral trust certificate; any note; any evidence of indebtedness, whether interest-bearing or not.

---

[2]For example, a mimeographed letter dated March 1964, describing defendants' plans for the operation of the hotel, contains this:

"Be sure to visit the Biltmore Hotel at your earliest convenience. Remember, we are not asking for gifts to meet the obligations there. . . . We accept loans at a very fine interest rate and use this as capital to continue the redecorating program. The next 60 days should see this completed. If you have money on interest. . . . Why not make this available to the 'Cup of Cold Water Ministry' and earn a most favorable rate of interest. . . . Plus. . . . The knowledge that you are making one of the most exciting beach ministries possible. Phone us . . . Write us . . . Come and make any inquiry about your part in this advance.'' (All dots in the original.)

(c) Any guarantee of a security.

(d) Any certificate of deposit for a security.''

Corporations Code section 25102 then provided:

''Except as otherwise expressly provided in this division, the Corporate Securities Law does not apply to any of the following classes of securities:

(a) Any security (except notes, bonds, debentures, or other evidences of indebtedness, whether interest-bearing or not) issued by a company organized under the laws of this State exclusively for educational, benevolent, fraternal, charitable, or reformatory purposes and not for pecuniary profit, no part of the earnings of which inures to the benefit of any private shareholder or individual.

(b) Bills of exchange, trade acceptances, promissory notes and any guarantee thereof, and other commercial paper issued, given, or acquired in a bona fide way in the ordinary course of legitimate business, trade, or commerce.

(c) Promissory notes, whether secured or unsecured, and any guarantee thereof, where the notes are not offered to the public, or are not sold to an underwriter for the purpose of resale.

(d) A promissory note, secured by a lien on a single parcel of real property, when such note is not offered to the public and is not one of a series of notes secured by interests in the same real property.''

Corporations Code section 25500 provides:

''No company shall sell any security of its own issue, except upon a sale for a delinquent assessment against the security made in accordance with the laws of this State, or offer for sale, negotiate for the sale of, or take subscriptions for any such security, until it has first applied for and secured from the commissioner a permit authorizing it so to do.''

Under the language of section 25008, a note is a security, but section 25102 exempts certain classes of such securities. None of those exemptions applies to the notes involved in this case. The subparagraph (a) exemption cannot apply here because that subparagraph excepts notes. Subparagraphs (c) and (d) by their express terms do not apply to notes offered to the public. The only arguable exemption is subparagraph (b), applicable to notes given in the ordinary course of business, trade or commerce.

The instruments listed in section 25102, subdivision (b), are those which are commonly used in commercial lending to finance specific transactions or to acquire working capital by

individually negotiated loans. The exemptions of section 25102 were designed to avoid any interference with these individual transactions, while protecting the public against the dangers inherent in the indiscriminate sale of instruments of indebtedness. The statutory purpose of providing such protection was explained in *In re Leach* (1932) 215 Cal. 536 [12 P.2d 3], which involved a conviction of a manager of a corporation which had sold 11 mortgage notes to a single investor, without a permit. In answer to the contention that the Corporate Securities Act was unconstitutional in that it interfered with the right of a property owner to borrow money on notes secured by a mortgage, the court said (at p. 543) :

''The general purpose and tenor of the Corporate Securities Act, as was said by the Supreme Court of the United States in the case of *Hall* v. *Geiger-Jones Co.*, 242 U.S. 539 [61 L.Ed. 480, 37 S.Ct. 217, Ann.Cas. 1917C 643, L.R.A. 1917F 514], in which that court sustained the constitutionality of legislation of that character are, 'To protect the public against the imposition of unsubstantial schemes and the securities based upon them.' If that is its purpose, and we think the authorities with scarcely an exception support that view, then we can see no real distinction between a scheme to float a bond issue by a corporation and one to place upon the market and dispose of to the public an issue of mortgage notes, even though the latter may be severally secured by liens upon separate and distinct pieces or parcels of property. Each of these two types of securities is placed under the supervision of the corporation commissioner by the Corporate Securities Act, and we can see no legal or reasonable grounds upon which the courts would be justified in drawing a distinction between them and in holding one to be a valid exercise of power by the legislature and the other contrary to constitutional restrictions. Our conclusion, therefore, upon this phase of petitioner's case is that the provisions of the Corporate Securities Act requiring a permit from the corporation commissioner before a corporation may issue and dispose of its promissory notes and other evidences of indebtedness, secured by mortgage or trust deed, apply only to such securities as may be offered to the public, and that as so construed it is not obnoxious to any provision of the state or federal Constitution.''

In the light of the legislative purpose and the statutory provisions read as a whole, a sale of promissory notes which are advertised and indiscriminately offered to the public at large, as described in the evidence here, is not what is meant by ''the ordinary course'' of business, trade or commerce.

It should be noted that although defendants invoked the charitable nature of their work as a part of their solicitation, the proposal which they made was strictly commercial business: Members of the public were invited to invest their funds and earn 6 percent interest. The defendants' improvident scheme to sell short-term notes to finance the refurbishing of an old hotel building was quite as dangerous to investors as the typical blue-sky promotion of mining stocks and oil royalties.

Defendants' principal contention here is that promissory notes which evidence only a debtor-creditor relationship, and which give the payee no interest in the assets or the profits, are not securities. For this argument defendants rely chiefly upon the language in *People* v. *Davenport* (1939) 13 Cal.2d 681 [91 P.2d 892]. In that case, the defendant was raising capital for his business by entering into a contract with an investor whereby the investor would sell to him building and loan certificates (which defendant might dispose of as the absolute owner thereof) and defendant would pay the investor the price in 25 monthly installments. The indictment charged that this contract was a note and an investment contract, issued for sale to the public by defendant without a permit.

The instrument, which was set forth in full in the indictment, was in the form of a bilateral contract which in no way resembled a note. The contract declared ''This instrument is non-negotiable and shall not be assigned by either party without the consent of the other.''

The Supreme Court held that this indictment failed to state a violation of the act. The Corporate Securities Act, as it then read, contained this definition in section 2(a):

''7. The word 'security' shall include any stock, bond, note, treasury stock, debenture, evidence of indebtedness, certificate of interest or participation, certificate of interest in a profit-sharing agreement, certificate of interest in an oil, gas or mining title or lease, collateral trust certificate, any transferable share, investment contract, or beneficial interest in title to property, profits or earnings, . . .'' (Stats. 1933, ch. 898, § 2(a), p. 2309.)

The *Davenport* opinion contains the following language:

''In construing the provisions of section 2(a), subdivision 7, which provide that 'The word ''security'' shall include . . . any note, . . . evidence of indebtedness, . . . investment contract . . . ', etc.,—in the light of the rules relating to the construction of statutes, which provide that words of general

import may be given a contracted meaning dependent upon the connection in which they are employed, and considering the general purpose or scheme entertained by the legislature in passing the statute, and the rule that words will not be given their literal meaning when to do so would evidently carry the operation of the enactment far beyond the legislative intent and thereby make its provisions apply to transactions never contemplated by the legislative body (*Lewis* v. *Creasey Corp.*, 198 Ky. 409 [248 S.W. 1046]),—it is clear that the legislature intended by the use of the words or phrases of general import in said section, such as 'note' and 'evidence of indebtedness', that each such expression should possess the same general characteristics as the word 'security', within the meaning of which the legislature provided that they were to be included.'' (At pp. 685-686.)

''All he had a right to expect by the transaction *was the payment of the agreed purchase price at the times stipulated,* plus the *interest* therein provided for. And as shown by the authorities herein cited, the expectation of the mere payment of *interest* does not transform the transaction into an 'investment' contract within the meaning of the act. (*Lewis* v. *Creasey Corp.*, 198 Ky. 409 [248 S.W. 1046] ; *State* v. *Whiteaker,* 118 Ore. 656 [247 P. 1077] ; 37 C.J. 275.) Nor was the seller of the certificate (the alleged purchaser of the 'security') *given any interest in any portion of the business.''* (At p. 690. Italics in the original.)

It required no elaborate reasoning to demonstrate that the bilateral contract set forth in the *Davenport* indictment was not a ''note'' within the ordinary meaning of that term. The opinion of the Supreme Court appears to have been directed primarily towards a proper definition of the term ''investment contract,'' for, as the court observed (at p. 686) ''in the generic sense of the word every contract is an 'investment' contract.'' To avoid such a literal reading of the act, the court invoked the rule ''that words of general import may be given a contracted meaning dependent upon the connection in which they are employed.''

Defendants here would interpret that language in *Davenport* as indicating that a promissory note is not a security unless it promises the holder something more than a repayment of his money with interest. Such an interpretation would create an irreconcilable conflict between *Davenport* and *In re Leach, supra* (1932) 215 Cal. 536, which had held that a mortgage note was a security. The *Davenport* opinion does not cite *Leach*. This omission cannot be taken as an oversight, or

as a silent rejection of the *Leach* opinion. Rather it supports the view that the court felt no discussion was needed to demonstrate that the *Davenport* contract was not a note.

Furthermore, the argument which defendants here attempt to construct from the *Davenport* opinion fails completely when applied to the definition of "security" as it was recast in 1949. In that year the Legislature made the Corporate Securities Act a part of the Corporations Code. Section 25008 of the Corporations Code for the first time broke down the definition of "security" into four subsections (Stats. 1949, ch. 384, p. 699). The proprietary and profit-sharing securities, including "any investment contract," were left in subdivision (a), while the creditor interests, including "any note," were listed in subdivision (b). This is the present form of the statute, quoted *supra*. The reasoning which defendants would derive from the *Davenport* opinion, giving the term "note" a contracted meaning because it was found listed with proprietary securities, is plainly inapplicable. The word "note" has been, since 1949, set apart from proprietary securities and listed with other kinds of instruments which ordinarily afford the holder only the right to the repayment of his investment and interest.

The 1949 codification of the Corporate Securities Act was the work of the California Code Commission, which disclaimed any intention to make any substantive change in the law.[3] The work of the Code Commission and of the Legislature doubtless was carried on with knowledge of the *Leach* and *Davenport* opinions. The redrafting of the definition in 1949 was to clarify the existing law and to resolve any ambiguities. This revision makes it clear that a note may be a security even though it does not give the holder a proprietary interest or a share of profits.

Further support for this conclusion is found in the reasoning of our Supreme Court in *Silver Hills Country Club* v.

---

[3] ". . . the commission has since 1935 consistently abided by the policy set forth in its 1935 report, and reiterated in every subsequent report:

'The commission in its work of revision and codification has adopted a definite policy not to make substantive changes, but to confine its work to a compilation, consolidation, and clarification of the existing law. Such changes in wording as are made, are made to resolve ambiguities or to conform with administrative practice and legislative intent. The revision and codification will present the existing law in such form as to facilitate greatly the making of such substantive changes as are found to be necessary.' " Report of the California Code Commission to the Governor and the Legislature of the State of California at the Legislative Session of 1949, page 8.

*Sobieski* (1961) 55 Cal.2d 811 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135] where the court said (at p. 814):

"Section 25008 defines a security broadly to protect the public against spurious schemes, however ingeniously devised, to attract risk capital."

The opinion declares (at pp. 815-816): "Since the act does not make profit to the supplier of capital the test of what is a security, it seems all the more clear that its objective is to afford those who risk their capital at least a fair chance of realizing their objectives in legitimate ventures whether or not they expect a return on their capital in one form or another. Hence the act is as clearly applicable to the sale of promotional memberships in the present case as it would be had the purchasers expected their return in some such familiar form as dividends. Properly so, for otherwise it could too easily be vitiated by inventive substitutes for conventional means of raising risk capital."

Although the *Silver Hills* case deals with a security which is very different from that involved here, the court's generalization is applicable: The Corporate Securities Act is designed to regulate the transactions by which promoters go to the public for risk capital. A public offering of unsecured notes falls easily within that statutory purpose.

There can be no question that this is the interpretation held by the Commissioner of Corporations. Ballantine & Sterling, California Corporation Laws (4th ed. 1967), wherein the chapter on the Corporate Securities Act was written by Donald A. Pierce, Assistant Commissioner of Corporations, states (Vol. 2, § 457.04, p. 901):

"Undoubtedly a sale of notes to the public in order to obtain borrowed working capital would clearly come under the jurisdiction of the Commissioner."

Defendants have also argued that the court erred in instructing the jury as to the definition of a security. The instructions given were based upon the statute, and are correct. The instructions proposed by defendants are incorrect because they say in substance that a note is not a security if it entitled the holder to no more than a return of his money with interest.

Defendants also complain that the court refused to give a requested instruction which defines proximate cause and informs the jury that "Criminal liability in law attaches only to the proximate cause of the harm." Although the proposed instruction is not explicit as to just how it applies, the brief on appeal indicates that defendants' theory is this: It

appears from the evidence that some of the investors were on close personal terms with defendant Walberg, and it is arguable that those persons would have been willing to lend money to the corporation if there had been no public offering. Therefore, defendants would argue, since the wrongdoing, if any, was the public offering, if the public offering was not what induced a particular lender to make his loan, the issuance of a note to such a lender could not be a violation.

No authority has been cited in support of defendants' theory of proximate cause, and nothing in the act tends to support it. The notes were securities because they were offered to the public to raise capital for the corporation's enterprise. The evidence shows that each of the 10 investors whose notes are the subject of this prosecution had been solicited by one or more of the public announcements. Under the circumstances each of the notes was a security, and each crime consisted in the issuance of one such security. In this context it would not be a defense to show that some of these people would have been willing to make the same kind of a loan had there been no public offering.

Defendants also complain that the court failed to give on its own initiative an instruction defining the term ''offered to the public.'' Defendants did not ask the trial court to give any such instruction. Although there may be cases in which a jury would require some special guidance in applying that language to the evidence, in this case the ordinary meaning of the statutory words seems clear enough as a standard for the jury's decision. Without doubt trial counsel refrained from requesting an instruction because they were satisfied that in the context of this case there was no need for it.

Defendants' attack upon the constitutionality of the securities act, upon the ground that it is vague and uncertain, appears to be premised upon defendants' own untenable interpretation of the meaning of the statute. *In re Leach* (1932) 215 Cal. 536, 543 [12 P.2d 3], holds that the definition and classification of notes as securities meets constitutional standards of clarity. Defendants' conduct falls well within the literal reading of the statutory prohibition. The charge of uncertainty is based upon defendants' assumption that the statute does not mean what it says.

The judgments are affirmed.

Jefferson, J., and Collins, J. pro tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.