[Crim. No. 3448. Fourth Dist., Div. Two. Feb. 20, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILIP C. HUMPHREYS, Defendant and Appellant.

## COUNSEL

Leland J. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Mark Leicester, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**GARDNER, J.**—In the latter part of 1965, the defendant was the chairman of the board of directors of the Southwestern Funding Corporation. His wife, Eleanor C. Humphreys, owned controlling interest in this corporation. Southwestern Funding held as a wholly owned subsidiary the Swan Lake Corporation which was developing the Swan Lake Mobile Home Park. The defendant was the corporate officer most immediately concerned with the management of the Park. The Park, which was still in the early stages of development, was not yet profitable, and Southwestern, the parent company, had been transferring funds to the Swan Lake Corporation to finance the Park's development. However, general business conditions prevented Southwestern from obtaining the additional financing it needed to support the continued development of Swan Lake Park.

Thus, defendant, who was at that time living at Swan Lake, conceived the idea of forming a new corporation to further the development of the Park area. Financing for the new corporation was to be obtained in two ways: defendant's wife, Eleanor C. Humphreys, would pledge certain oil leases she owned as collateral for borrowed capital and money would be solicited from private individuals in return for interest-bearing demand notes. It was the quest for funds from this latter source which led to the charges presently under review.

Defendant discussed this idea with Floyd Hallowell, a resident of the Swan Lake Park and one of the codefendants named in the grand jury indictment. (Defendant had met Hallowell when the latter had agreed to

investigate means by which the Swan Lake Park overhead might be reduced, this work having been done on a voluntary basis.) It was agreed that the demand notes would be sold only to residents of the Swan Lake Park. Although the new corporation was originally intended to develop the land around the Park, it was determined that the capital raised would be used to facilitate the financing of mobile homes by incoming residents of Swan Lake Park. Evidently, Lyle Francis, the business manager of the Swan Lake Corporation and the second codefendant named in the original indictment), was brought into the plan, as there was evidence that he handled the negotiations leading to the sale of some of the notes.

The notes themselves were to pay 7 percent interest per annum; they were unsecured, but payable upon demand. In his conversation with Hallowell, defendant stated that he would personally stand behind the notes in the event the new corporation should fail. However, Hallowell testified that he made no representations to this effect to any of the purchasers. No permit was ever received from the Corporations Commissioner authorizing the issuance of these notes.

Investors made their checks payable to the Swan Lake Development Corporation, a name under which defendant did business for a time; no articles of incorporation were ever filed for this entity. The demand notes were issued by the Associated Funding Corporation, a duly organized corporation of which defendant was president and his wife secretary-treasurer. Both defendant and his wife signed the notes in their corporate, though not their individual, capacities.

Hallowell purchased one of the notes himself. He also did the bulk of the soliciting among the residents of Swan Lake Park. Hallowell testified that he contacted approximately 18 residents of the Park concerning the possible purchase of the notes. However, defendant was charged with eight counts of selling securities without a license; the individuals to whom the notes were sold in each count were:

COUNT I: Arthur R. Truscott
COUNT II: Arthur W. Dagg
COUNT III: N. George Cummings
COUNT IV: Edwin D. Sayre
COUNT V: Alice Sayre
COUNT VI: Harold H. Pulliam
COUNT VII: Estell Cumming
COUNT VIII: Dorothy Davidson

In each instance, the purchaser first learned of the possibility of purchasing the note either from defendant, Hallowell, Francis or rumor circulating

by word of mouth in the Park. In each case, the negotiations preliminary to the purchase of the note were conducted by either Hallowell or Francis on behalf of the seller. Arthur Truscott and Edwin Sayre testified that they initially approached the sellers on the subject of purchasing the note. All the purchasers were familiar with the defendant in varying degrees. Some only knew defendant by sight; some had attended parties with him at the Swan Lake Club. There was no evidence that any had known defendant prior to moving to Swan Lake Park or had had prior business dealings with him. A number of them testified that they assumed the defendant would stand behind the notes with his personal wealth.

 ■ Defendant's only contention is that the court erred in finding that the sale of the notes was a "public offering" within the meaning of subdivision (e) of section 25102 of the Corporations Code. Thus, the attack is upon the sufficiency of the evidence to sustain this finding. Such a finding will not be disturbed if there was substantial evidence to support it. ■ Before a judgment of conviction may be reversed for insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the lower court's conclusion. (*People* v. *Clark,* 215 Cal.App.2d 734, 737-738 [30 Cal.Rptr. 487], cert. den. 375 U.S. 943 [11 L.Ed.2d 274, 84 S.Ct. 350].)

To test the finding of the trial court, defendant has requested that this court take judicial notice of guidelines promulgated by the Division of Corporations pertaining to the issue of public offerings. Respondent agrees that the factors mentioned in these guidelines are worthy of consideration in light of the purpose of the act as established by judicial precedent. We adopt these suggestions inasmuch as these guidelines appear to be a compendium of applicable law. They appear in Bulletin No. 67-5, dated May 25, 1967, issued by Robert H. Volk, Commissioner of Corporations, and are entitled "Guidelines for Determining when Securities are Being 'Offered to the Public.' "

These Guidelines are:

 (1) The number of offerees.

 (2) The relationship of the offerees to each other.

 (3) The relationship between the issuer and the offerees.

 (4) The size of the offering.

 (5) The manner of the offering, and

 (6) The character of the security offered.

These are substantially the standards set forth in a jury instruction on

the subject of "public offering" which was approved by the United States Court of Appeals in *Edwards* v. *United States,* 374 F.2d 24, with the addition in that case of "whether the particular persons affected stood in need of the protection of the registration." Other tests which we consider pertinent are (1) the character of the security issued, and (2) the ease with which the security may be transferred from the original to the subsequent purchasers. We shall discuss each of these criteria in testing the lower court's determination.

## I.

### THE NUMBER OF OFFEREES.

Obviously, the greater the number, the more likely the offering was public and, conversely, the smaller the number, the more likely the offering was private. ■ The significant factor is not the number of ultimate purchasers but rather the number of offerees.

Here, Hallowell testified that the notes were to be sold only to Swan Lake Park residents and that there were approximately 220 residents. He approached only 18 people; however, both Hallowell and the defendant testified that the availability of the notes was a matter of common knowledge among the Park residents. There was additional evidence tending to show that the offering was open to persons who were not residents of the community. Mrs. Davidson, for instance, had moved out of the community and appellant testified that the limitations of the offering were not clearly established. ■ Thus, it would appear that the offering was more than to a small, select, relatively insignificant number of persons.

## II.

### THE RELATIONSHIP OF THE OFFEREES TO EACH OTHER.

There does not appear to be a close relationship of blood, friendship or business association among the offerees—only the accident of geographic proximity.

## III.

### THE RELATIONSHIP BETWEEN THE ISSUER AND THE OFFEREES.

The fact that the investors are relative strangers to the issuer suggests a public offering. In this case, there was substantial evidence that no close relationship existed.

Edwin Sayre did not consider defendant a close friend. Estelle Cumming had only seen defendant walking around the Park on occasions. Arthur R.

Truscott's relationship with defendant consisted only of having been introduced to him. Harold Pulliam and N. George Cummings knew defendant, however, neither testified that they were particularly close friends. Arthur W. Dagg knew defendant well but had never discussed the matter of the notes with him personally nor had Mrs. Cumming, Mr. Pulliam or Mrs. Davidson, while the testimony of Mr. Hallowell, the agent of the defendant, was that all of the 18 people with whom he discussed the notes were "friends." This at the most creates a conflict in the evidence and the trial court's finding on this issue is binding on the court.

## IV.

### THE SIZE OF THE OFFERING.

An offering of only a few units is less likely to be considered of a public character than one consisting of a large number of units. This is obviously a difficult test to apply. It is probably most helpful from a negative viewpoint, i.e., that an offer of a million units would certainly tend to show a public offering, conversely, an offer of one unit could hardly be concluded a public offering. In between these extremes, the standards become nebulous. In this case, the size of the offering is such that it could reasonably be held to be a public offering.

## V.

### THE MANNER OF THE OFFERING.

As the Corporation Commissioner points out in his "Guidelines" and as the cases agree, this is a particularly significant factor.

The fact that the initiative proceeds from the purchaser tends to indicate a private offer, and, conversely, if the initial approach was made by the offerer, one may more readily infer the offer as public. If the offerer makes use of public media, a public offer has almost conclusively been established. Here, the offer was initiated by the issuing party. (Some of the purchases were made upon the request of the purchaser; however, these individuals acted in response to the news that the defendant was issuing the notes.) However, there is no evidence that defendant made use of the news media to publicize his offer. This offer was made through the agency of Hallowell and Francis and then by word of mouth. The fact that the community's social activities centered around the resident club, made the use of media unnecessary. It is also significant that defendant provided his representatives and prospective buyers with a balance sheet relating to the proposal.

We do not feel that the lack of the use of news media is fatal to the finding of the trial court that this was a public offering. We feel that the evidence

in this case reasonably would support a conclusion that the manner of the offering was such as to indicate a public offering.

## VI.

### THAT THE PARTICULAR PERSONS AFFECTED STOOD IN NEED OF THE PROTECTION OF THE CORPORATE SECURITIES LAW.

Mrs. Cumming was an elderly lady devoid of any sophistication in the investment field. Defendant points out that this witness had the opportunity of the benefit of counseling from her niece, the witness Dorothy Davidson, "a person experienced in the financial field." Her employment by a savings and loan company does not necessarily make her "experienced in the financial field," and under any circumstances, the fact that an unsophisticated offeree has an opportunity to secure expert advice can hardly inure to the benefit of the defendant.

The others, including Mrs. Sayre who was a school teacher, were, insofar as the record is concerned, lacking in any truly sophisticated financial or business ability.

This court obviously has no opportunity to observe the witnesses, and the remarks of the trial court in this respect appear pertinent. The trial court said, in announcing its decision: "Certainly there isn't any one of them, with Hallowell included—but he is not one of the persons named in one of the counts—certainly none of the other eight were in a position where it could be said that with sophisticated discernment they reached a conclusion as to whether they were making a proven investment.

"That just to take an example, would anybody suggest that Estelle Cumming made an investment from the standpoint of one with sophisticated discernment? That is ludicrous.

"So these people fell within the purposes of the acts. They needed the protection of the act and did not have it."

It would appear basic that offerees in a private offering should be familiar with offerer's general character and business skills, the risks and opportunities of the project being embarked upon and the structural characteristics of the entity they are joining.

There is no evidence that any of the offerees had earlier participated in any of the defendant's business ventures. Some knew him in a social context. Others did not even have that familiarity. It does not appear that any of them had any significant knowledge of the business world nor were they aware of the risk in the financing of mobile homes. None had any knowledge of the structural characteristics of the corporation from whom

they were purchasing notes. In fact, it appears that they had not the slightest idea by whom the notes were to be issued.

 It would appear that the offerees, as a class, were the type who needed the protection of the Corporate Securities Law.

## VII.

THE CHARACTER OF THE SECURITY ISSUE.

The more like securities commonly in circulation, the more likely they will be considered a public offering. In the instant case, the notes, interest bearing, unsecured and payable on demand, are similar to short term commercial paper which is in widespread use.

## VIII.

THE EASE WITH WHICH THE INDEBTEDNESS MAY BE TRANSFERRED FROM THE ORIGINAL TO SUBSEQUENT PURCHASERS.

The more readily the transfer may be made, the more likely the offering to be deemed public. If the offerer hopes to have the issue classified as private, he should take some pains to restrict the transferability of the securities. Here, there were no restrictions placed upon the resale of the notes by the original purchasers.

Tested by the above standards, there was substantial evidence adduced to support the trial court's finding that the offering of the defendant was public rather than private.

Judgment affirmed.

Kerrigan, Acting P. J., and Tamura, J., concurred.