**In re CHRISTIAN LIFE CENTER, etc., Debtor and Debtor-in-possession.**

**George KERSH and Lucille Kersh, Plaintiffs/Appellants,**

**v.**

**CHRISTIAN LIFE CENTER, etc., et al., Defendants/Appellees.**

**Clyde C. GRECO, Sr., et al., Plaintiffs/Appellants,**

**v.**

**CHRISTIAN LIFE CENTER, etc., et al., Defendants/Appellees.**

**BAP Nos. NC–81–1251–GEAs, NC–81–1252–GEAs.**

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued Jan. 21, 1983.

Decided June 20, 1984.

Garry Koenigsberg, Law Offices of Timothy H. Fine, San Francisco, Cal., for plaintiffs/appellants.

Malcolm A. Misuraca, Misuraca, Beyers & Costin P.C., Santa Rosa, Cal., for defendants/appellees.

Before GEORGE, ELLIOTT and ASHLAND, Bankruptcy Judges.

## OPINION

LLOYD D. GEORGE, Bankruptcy Judge:

An appeal has been taken in this adversary proceeding from a judgment of dismissal, based upon orders of the trial court, partially denying summary judgment to the plaintiffs and denying the motion of the plaintiffs to amend their complaint to add new parties plaintiff on one of their causes of action. We reverse and remand for further proceedings consistent with our decision herein.

### I. BACKGROUND

The Christian Life Center (hereinafter referred to as "CLC") is an Assemblies of God church located in Santa Rosa, California. In 1972, the CLC began a number of building activities. In order to finance this building effort, the CLC, through its pastor, Rev. A. Watson Argue, and other church officers, organized what they termed a "trust fund," an idea they borrowed from another Assemblies of God church in Modesto, California, and from a Baptist church in Santa Rosa.

Although there is some dispute over the means by which the trust fund was administered, it is clear that two types of instruments were utilized by those wishing to invest in the fund. The first instrument was a "trust agreement," which permitted the "trustor" to name a beneficiary to receive funds upon his death. The second type of instrument was a "certificate of deposit"—in reality, an unsecured note, bearing a maturity date of one year. Both types of instruments bore a set interest rate, which increased with the amount of the deposit. (Usually, the interest rates varied from six percent (6%) to nine percent (9%).

As the trust was organized, some 30% of the deposited funds remained in a reserve account, which was invested in liquid securities. The rest appears to have gone directly to the CLC. There is some argument as to the legal method by which the CLC obtained the use of these funds. The appellees claim that these advances were loans to the CLC; the appellants state that no loan documents were ever executed and that the CLC used the funds as if they were its own money. Thus, the appellants argue that no distinct "trust fund" ever existed, separate from the funds of the CLC, itself, except, perhaps, with respect to the reserve amounts retained, in liquid form, by the CLC. Notwithstanding this argument, however, it is clear from the record that depositors were largely aware that 70% of their invested funds was being used by the CLC for its various building projects.

In addition to the 30% reserve fund, the CLC also maintained a $500,000 letter of credit from a local bank, should an emergency cash need arise.

It would appear, from the documentary and other evidence presented to the lower court, that the funds for the trust were generally solicited from those who attended the CLC meetings and that no *media* announcement concerning the trust fund was ever made. Nevertheless, Reverend Argue seems to have encouraged the members of his congregation to invite their friends to deposit their money into the trust, purely on an investment basis. In this regard, the "Church's First Amended Disclosure Statement," dated February 5, 1980, contains a notation that "[m]anagement believes that over 50% of the total amount of the Deposits and 50% of the total number of Deposits are owned by Church members, or other participants in Church ministries or the friends or relatives of those members or participants." E.R. at 159.

In any event, during the time the trust fund was operated, a large portion of the CLC congregation consisted of persons who were not technically "members" of the church, although their church attendance may have been quite regular.

From the inception of the CLC trust fund, questions existed as to whether the notes and agreements executed by the trust were "securities" and, thus, subject to registration under California securities law. Following the initiation of the trust fund, an official of the California Department of Corporations issued a letter stating his opinion that these instruments were securities. The CLC officers, however, believed that such was not the case and went forward with the trust fund arrangement, without any meaningful attempt at compliance with the state registration requirements.

With time, the trust fund grew to the sum of $7.2 million, with more than 1100 depositors. During this time, the California Commissioner of Corporations took no action against the CLC trust fund, its trustees, or other principals. Nevertheless, on May 31, 1978, following an investigation by a local newspaper, the California Superintendent of Banks issued a cease-and-desist order against the trust fund. Thereafter, there was a "run" on the fund, which eventually resulted in its collapse.

The appellants are twelve unpaid investors in the trust fund, at least two of whom were not members of the CLC congregation. On July 10, 1979, these appellants brought an action for rescission and to recover damages against these appellees in

the Sonoma County Superior Court. This complaint was founded upon 1) an alleged violation, by the defendants, of the California securities laws, 2) fraud in the inducement, due to the alleged knowing failure of Reverend Argue to inform these investors of the potential securities violations involved in the CLC trust fund arrangement, and 3) damages for money had and received by the CLC. Additionally, a request was made for an equitable lien on the CLC property.

Pursuant to this complaint, on August 27, 1979, an attachment was made on the CLC property.

On October 12, 1979, CLC filed its petition for relief under Chapter 11 and the appellants' lien of attachment was thereafter dissolved by the bankruptcy court. The state court action was then removed to the bankruptcy court.

Following some extensive discovery by both sides, on October 17, 1980, two motions were brought before the bankruptcy court, by the appellants. The first motion sought to amend the appellants' complaint to add six additional defendants on the fraud portion of the complaint. The second motion requested that summary judgment be granted on all counts, except that alleging fraud.

About this same time, the CLC also moved for summary judgment on the appellants' equitable lien request and upon its cross-complaint for a judgment declaring that the appellants had no priority over other unsecured creditors.

After briefing and oral argument, the trial court denied the appellants' first motion, noting that the appellants had known of the actions of the potential fraud defendants for several months prior to the filing of their motion. This delay and the consequent need for additional discovery warranted, in the trial court's opinion, a denial of the motion to amend the appellants' complaint to add these defendants. The court also partially denied the appellants' second motion, excepting only the effect of that motion upon the appellants' third cause of action (for money had and received), which

had been rendered moot by the debtor's acknowledgment of the appellants' position as unsecured creditors.

In denying the greater part of the appellants' second motion, the trial court ruled that the state securities laws were not meant to include trust agreements and certificates of deposit, as were used by the CLC trust fund. The lower court, therefore, refused to grant a rescission of the trust agreements and certificates of deposit as unregistered securities. The court further refused to grant summary judgment for damages against Reverend Argue and the other officers of the CLC under the California derivative liability laws. Finally, the appellants' request for an equitable lien was also denied. (The court of fraud against Reverend Argue was eventually heard by a jury, which held in favor of that defendant. The judgment based upon that verdict, however, is also currently the subject of an appeal.)

On September 16, 1981, the trial court entered a judgment of dismissal, based upon each of these determinations. This judgment contained the certificate of finality required by Fed.R.Civ.P. 54(b), thus rendering appealable, without further delay, its decision on these issues.

The appellants now appeal from the trial court's judgment of dismissal and, implicitly, from the denial of each of their motions.

## II. ANALYSIS OF THE ISSUES OF FACT AND LAW

Before we examine the various issues of fact and law raised by these parties, the panel would first note that a great many "non-issues" have been argued by counsel on both sides. There have been many recriminations dealing with the root causes of the troubles of this debtor and of these investors. The parties have parried with each other over their relative good faith. Counsel, themselves, have taken umbrage with opposing counsel's handling of their case. The panel finds that these matters are, largely speaking, irrelevant to the questions raised by this appeal. No atten-

tion shall be paid to such issues, therefore, unless they bear some relation to the issues of fact and law now before us.

The appellants have presented the panel with three primary issues. First, they argue that the trial court erred in refusing to permit them to amend their complaint to include the six additional fraud defendants. Second, they claim that the trial court erred, both in fact and in law, in determining that the CLC trust fund was not subject to the California securities laws. Finally, the appellants maintain that it was error for the trial court to refuse to find the individual defendants liable for the securities violations attributable to the CLC.

### A. The Appellants' Motion to Amend Their Complaint

■ The trial court's conclusions of law and order, in this matter, state only one ground—untimeliness—for its refusal to permit the appellants to amend their complaint to include the six new fraud defendants. Its judgment of dismissal adds only the notation that "[n]o further attempts have been made to amend the complaint." Fed.R.Civ.P. 15(a) mandates, in pertinent part, that

> "[a] party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party; and *leave shall be freely given when justice so requires.*"

(Emphasis supplied.) Looking to this liberal standard for granting amendments under this rule, the United States Court of Appeals for the Ninth Circuit has held that delay alone is not a sufficient ground for denying a motion to amend. Rather, the party opposing the motion to amend must make a showing that it suffered prejudice because of the movant's delay in seeking an amendment to his pleadings. *Howey v. United States,* 481 F.2d 1187 (9th Cir.1973).

■ The appellees' argument that they would have suffered such prejudice because of their need to conduct additional discovery is also not, in itself, sufficient to deny an amendment of pleadings. *See Middle Atlantic Utilities Co. v. S.M.W. Development Corp.,* 392 F.2d 380 (2d Cir. 1968). This is especially true, in light of the three-month hiatus between the time of the appellants' motion and the scheduled date of the trial in the instant proceeding.

■ Finally, the fact that the appellants did not seek to renew their motion to amend, after the scheduled trial date was continued, is irrelevant. They had been instructed by the trial court that their motion could not be granted because it was untimely. They were, thereafter, given no reason to believe that a renewal of their motion would be deemed any more timely, simply because of the continuance of the trial. It was not improper, therefore, for them to decline further action on this motion, pending an opportunity to appeal the trial court's prior decision.

■ Notwithstanding the significant degree of discretion which is generally given trial courts in ruling on motions to amend pleadings, we must, nevertheless, hold that this court's refusal to permit the amendment requested by the appellants was an abuse of that discretion.

### B. The Appellants' Motion for Partial Summary Judgment

The decision of the trial court to deny the appellants' motion for partial summary judgment and, subsequently, to grant a judgment of dismissal in favor of the appellees on the issue of securities registration violations, was based, largely, upon the court's finding and conclusion that

> "[T]he trust agreements and certificates of deposit used by CLC are not securities under the California Corporate Securities Act of 1968, because they are not within the intent and spirit of the Securities Act, and because the circumstances of this

case exhibit no evidence of obvious fraud or a scheme against the depositors."

The appellants contend that this finding and conclusion does not comport with the applicable California statutory and case law requirements for ascertaining 1) whether an instrument is a security and (2) whether the use of an instrument constitutes an actionable violation of the securities registration laws. We agree with this assessment.

### 1. The Applicable California Statutes

The California statutory law which is sought to be applied to the actions of the CLC, its trust fund, and its officers, is found in sections 25000, *et seq.*, of the California Corporations Code.

Included in the definition of "security," under section 25019 of the California Corporations Code, is "any ... evidence of indebtedness." This definition, however, specifically excludes "any beneficial interest in any voluntary inter vivos trust which is not created for the purpose of carrying on any business or solely for the purpose of voting...." With respect to securities, section 25110 of the Corporations Code states that

"[i]t is unlawful for any person to offer or sell in this state any security in an issuer transaction (other than in a transaction subject to Section 25120), whether or not by or through underwriters, unless such sale has been qualified under Section 25111, 25112 or 25113 (and no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification) or unless such security or transaction is exempted under Chapter 1 (commencing with Section 25100) of this part."

Exempted from the application of Section 25110, by Section 25100(j) is, "[a]ny security (except evidences of indebtedness, whether interest bearing or not) of an issuer (1) organized exclusively for educational, benevolent, fraternal, religious, charitable, social, or reformatory purposes and not for pecuniary profit, if no part of the net earnings of the issuer inures to the benefit of any private shareholder or individual, ...." Further exempted from the qualification requirements of Section 25110, by section 25102(e), is "[a]ny offer or sale of any evidence of indebtedness, whether secured or unsecured, and any guarantee thereof, in a transaction not involving any public offering."

Section 25503 of the Corporations Code imposes civil liability upon "[a]ny person who violates Section 25110," and sets forth the standards by which damages are to be assessed. Finally, Section 25504 imposes derivative liability, upon persons other than the actual violator of Section 25110, with the following language:

"Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

### 2. The Issue of Fraudulent Intent

■ Although one of the primary purposes for the above statutory scheme for regulating securities was, undoubtedly, to reduce the incidence of securities fraud, we agree with the appellants that liability may be imposed upon a person, by these provisions, without a finding of actual fraudulent intent by that person. *See Tomei v. Fairline Feeding Corp.*, 67 Cal.App.3d 394, 137 Cal.Rptr. 656 (1977). In this regard, fraud in the sale of securities is treated separately, under section 25400 of the Corporations Code.

To the extent that the trial court found and concluded that an absence of actual fraud would remove the transactions involved in this case from the coverage of the above-cited statutes, we must disagree with its analysis.

### 3. Defining a "Security"

A more troublesome issue raised in this appeal deals with the question of whether the instruments issued by the CLC trust fund were "securities," under section 25019 of the California Corporations Code and applicable case law. In the mind of this panel, these instruments, as used by the CLC trust fund, represented evidences of the indebtedness of the fund to its depositors.

In announcing this determination, we do not wish to imply that all trust agreements will qualify as "evidence of indebtedness" under the California—or Federal—securities laws. As used in the present case, however, we believe that there is substantial evidence that these trust agreements were intended only to provide the depositor with a written record of his investment, with a contractual statement of the terms upon which that investment was made. This would seem to bring these trust agreements well within the contemplation of term, "evidence of indebtedness," as used by Section 25019, to define a security, and in Section 25100(j), as an exception to the exemption made for the securities of not-for-profit religious organizations. A certificate of deposit even more clearly falls within the definition of this term.

A determination that these instruments fall within the general definition of a security, however, would not necessarily be disposition of whether they will remain within that definition, under the various statutory and case law exceptions cited by the appellees.

The first of these exceptions is found within Section 25019, itself, and excludes from the definition of "security," "any beneficial interest in any voluntary inter vivos trust which is not created for the purpose of carrying on any business or solely for the purpose of voting." The appellees maintain that their use of the trust device was explicitly intended to bring their fundraising efforts within this exception to the California securities laws. The appellants counter by claiming that, regardless of what the intent of the appellees may have been, their "trust" never functioned as a separate entity from the CLC, itself. At least, with respect to the 70% of the funds provided by depositors which found their way to the CLC, the appellants argue that the trust concept was completely abandoned by the CLC. Instead, it is alleged that the funds were commingled, indiscriminately, with the assets of that entity.

An examination of the record provided by the appellants raises a substantial doubt, in the mind of this panel, that the handling of the CLC "trust" fund was such as to bring the instruments issued by it within the exception found in subsection (1) of Section 25019 of the California Corporations Code. In this regard, there is, apparently, competent depositional testimony to the effect that "[t]he trustee committee never functioned as a board of trustees. The church council actually made all decisions related to the trust fund." E.R. at 373. The "Church's First Amended Disclosure Statement," dated February 5, 1980, admitted that "[a]lthough the fund thus accumulated was entitled a trust fund, no formal 'declaration of trust' was made by the Church, and the Trust Fund has never been a separate legal entity. The Trust Fund rather should be considered as part of the Church. Its assets and liabilities are those of the Church." E.R. at 160.

■ It has been often noted that, in ascertaining whether an instrument or document represents a security, a court must look beyond form to the substance of the underlying transaction. *United States Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *Silver Hills Country Club v. Sobieski*, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). Because of its basis in a motion for

summary judgment, the record in this matter is somewhat confusing and incomplete. Nevertheless, we believe that this record adequately manifests a substantial factual dispute over the true nature of the financing arrangement adopted by the CLC in its building efforts. While many of the documents used by the CLC trust fund incorporate the language of a trust, it is arguable that the CLC and its officers did not always treat the funds obtained from depositors as being subject to that trust.

Few rules are more basic to federal civil procedure than the general requirement that a motion for summary judgment be denied when a genuine issue of material fact remains to be resolved. 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.04(1), at 56–69 (2d ed. 1983); *Hotel & Rest. Emp. & Bartenders, Etc., v. Rollison*, 615 F.2d 788 (9th Cir.1980). The lower court did not err, therefore, in denying the appellants' summary judgment motion, given the existence of this important question of fact relating to the applicability of the California securities laws to the CLC trust fund. Nevertheless, to the extent that it may have relied upon the trust exception to the Section 25019 definition of "security," to find and conclude that the CLC trust fund transactions were not covered by the California securities laws, and to later dismiss the securities violation count of the appellants' complaint, the trial court must be found to have erred.

It is difficult, however, to decide whether the lower court did, in fact, rely upon this argument of the appellees. Its finding and conclusion, in this regard, is simply that "the trust agreements and certificates of deposit used by CLC are not securities under the California Corporate Securities Act of 1968, because they are not within the intent and spirit of the Securities Act, . . . ."

This statement more clearly seems to address the second exception which has been made to the general definition of a "security." This exception has its roots in both federal and state case law and recognizes that certain transactions may use a form listed as constituting a "security" under statutory definitions but still fall outside the types of transactions meant, by the legislature, to be covered by the law. As noted by the United States Supreme Court in the seminal case of *United Housing Foundation, Inc. v. Forman, supra,*

> " '[a] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' "

*Id.,* 421 U.S. at 849, 95 S.Ct. at 2059, *citing Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). Thus, parties may use an instrument, document, or other legal device which, technically, falls within the general definition of a "security," but be involved in a type of transaction whose economic realities are not the same as those for which the securities laws were meant to be applied. More important than the means used to accomplish the transaction is the question of whether the transaction, itself, is one of the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits solely from the efforts of the promoter or third party." *Securities & Exch. Com. v. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

This question has been expressed by the United States Court of Appeals for the Ninth Circuit as being "whether the funding party 'contributed "risk capital" subject to the "entrepreneurial or managerial efforts" of [others].' " *United California Bank v. THC Financial Corp.,* 557 F.2d 1351, 1358 (9th Cir.1977). This "risk capital" test standard was first set forth in the California Supreme Court case of *Silver Hills Country Club v. Sobieski, supra, see United California Bank v. THC Financial Corp., supra* at 1358 n. 9, and has been applied in a California Court of Appeals case, virtually identical to the facts of the matter now before us, to find short-term notes, bearing a set rate of interest, to be securities under the wording and intent of the California Corporations Code.

We feel compelled to follow this clear statement of California law.

In *People v. Walberg*, 263 Cal.App.2d 286, 69 Cal.Rptr. 457 (1968), a pastor and radio evangelist solicited funds for the renovation of an existing building to serve as a home for the aged. Rather than ask for donations, the pastor offered to borrow the money, at a fixed rate of interest, on short-term notes. When these notes were not repaid, the California Attorney General's office brought a criminal action against the pastor and other church officers, under Section 26104 of the former California Corporations Code.

Following a guilty verdict, an appeal was taken to the California Court of Appeals, with the appellants arguing, in part, that the short-term, fixed-rate notes used by them were not securities under California law.

In disagreeing with this assessment, the appellate court first observed that the charitable purpose for the solicitation was irrelevant to whether it violated the state securities laws. The court noted, in this regard, that

> "although defendants invoked the charitable nature of their work as a part of their solicitation, the proposal which they made was strictly commercial business: Members of the public were invited to invest their funds and earn 6 percent interest. The defendants' improvident scheme to sell short-term notes to finance the refurbishing of an old hotel building was quite as dangerous to investors as the typical blue-sky promotion of mining stocks and oil royalties."

*Id.* at 291, 69 Cal.Rptr. at 461. The California appellate court then differentiated the facts and law in that case from an earlier California Supreme Court decision, which had refused to define a bilateral contract for the sale of building and loan certificates as a security. Instead, the court looked to the "capital risk" analysis used in the *Silver Hills* case, ultimately holding that

> "[a]lthough the *Silver Hills* case deals with a security which is very different from that involved here, the court's generalization is applicable: The Corporate Securities Act is designed to regulate the transactions by which promoters go to the public for risk capital. A public offering of unsecured notes falls easily within that statutory purpose."

*Id.* at 294, 69 Cal.Rptr. at 463.

If a finding were to be made that the protections inherent in the "trust" device used by the CLC Trust Fund were never properly observed by the debtor and its officers, we can see little meaningful economic difference between the issuance of certificates of deposit or trust agreements, at fixed rates of interest, to accomplish the funding of capital improvements, and the sale of fixed-rate, short-term unsecured notes for the same purpose. We must, therefore, decline to except these instruments from the definition of a "security," pursuant to the "economic reality/risk capital" standard outlined above, upon the record now before us. Rather, this matter will be remanded to the lower court for an evidentiary hearing on the relationship between the CLC trust fund and the CLC, itself.

### 4. A Public or a Private Offering?

Even assuming, arguendo, that the instruments used by the CLC in its funding efforts were securities, the appellees, nevertheless, maintain that the "offering" was made only to a relatively-small, religiously-related group and was not, therefore, a public offering. This would bring the transaction within the exemption to the provisions of Section 25110 found in Section 25102(e).

 Although the issue of whether an offering is public or private is, in part, a question of fact, *see People v. Skelton*, 109 Cal.App.3d 691, 167 Cal.Rptr. 636 (1980), we hold that the uncontested facts set forth in the trial record support, as a mat-

ter of law, a conclusion that the offering made by the CLC was public in nature. In this regard, the guidelines for establishing when an offering is public, under California law, were best set forth in *People v. Humphreys*, 4 Cal.App.3d 693, 84 Cal.Rptr. 496 (1970). These guidelines are six-fold:

> "(1) The number of offerees.
>
> (2) The relationship of the offerees to each other.
>
> (3) The relationship between the issuer and the offerees.
>
> (4) The size of the offering.
>
> (5) The manner of the offering, and
>
> (6) The character of the security offered."

*Id.* at 697, 84 Cal.Rptr. at 498 (citing a bulletin of the California Commissioner of Corporations).

### a. The Number of Offerees

"Obviously, the greater the number, the more likely the offering was public and, conversely, the smaller the number, the more likely the offering was private. The significant factor is not the number of ultimate purchasers but rather the number of offerees." *Id.* at 698, 84 Cal.Rptr. at 498. In the present case, the actual number of investors was about 1100. The potential number of offerees cannot be readily ascertained, because the approximately 5000 congregants of the CLC were asked to invite their friends and associates to invest in the CLC trust fund. We believe that this relatively large number of offerees and potential offerees would indicate that the offering was public.

### b. The Relationship · of the Offerees to Each Other

There does appear to have been at least the bond of friendship or other association among the offerees. Investment in the trust fund, however, was not limited to congregants or their friends. Potentially, anyone could have been a depositor. At best, the facts relating to this factor are neutral.

### c. The Relationship of the Offerees to the CLC

Although a rather large number of actual CLC trust fund investors were congregants at the CLC, many investors were not associated with the debtor prior to depositing their money in the trust fund. The debtor's own statement places the number of deposits not owned by church members, other participants, friends, and relatives of members or other participants, at approximately 50%. E.R. at 159.

At least one California Court of Appeals has held that "in order to grant [an] offeror the private offering exemption, *all the offerees* to the transaction must have either a preexisting personal or business relationship with the offeror or must be sophisticated investors who are able to protect their own interest in connection with the transaction."

*People v. Parks*, 87 Cal.App.3d 550, 565, 151 Cal.Rptr. 146, 153 (1978) (emphasis supplied), *citing* Cal.Admin.Code, tit. 10, § 260.102.2. The record before us would not indicate any high degree of business sophistication in the CLC investors. Rather, they appear to have been drawn from a cross-section of the local community. Certainly, the solicitations made by Reverend Argue were not aimed solely at sophisticated lenders.

The facts relating to this particular guideline would strongly indicate a public offering by the debtor and its officers.

### d. The Size of the Offering

As noted by the *Humphreys* court, this guideline is a "difficult test to apply." *People v. Humphreys, supra*, 4 Cal.App.3d at 699, 84 Cal.Rptr. at 499. Nevertheless, we believe that an offering of an unstated number of certificates of deposit and trust agreements, in a limitless amount, is large enough to indicate the existence of a public, as opposed to a more relatively small and private, offering.

### e. The Manner of the Offering

While the use of the public media to solicit investors may, conclusively, establish the public nature of an offering, *id.* at 699, 84 Cal.Rptr. at 499, the absence of such media exposure is not necessarily fatal to a claim that an offering was public. In the present case, we take special note that the offeror 1) first approached the potential offerees (a factor found to be significant in the *Humphreys* case, *id.*), and 2) sought to use congregants as a means of disseminating knowledge of the CLC trust fund to persons outside the congregation. As noted by the *Humphreys* court, "word of mouth" can be a sufficient means of spreading knowledge of a securities offering and may render media announcements unnecessary. *Id.* Once again, we feel that this guideline has been satisfied in determining that the CLC trust fund offering was public.

### f. The Character of the Security Offered

"The more like securities commonly in circulation, the more likely they will be considered a public offering." *Id.* at 701, 84 Cal.Rptr. at 500. This consideration relates, to some extent, to the question which remains to be determined by the trial court. To the degree that the substance of the CLC trust fund arrangement was that of a bona fide trust, we believe that the instruments used were somewhat unlike commonly-used securities. If these instruments were little more than demand notes, we have already observed their similarity to fixed-interest, short-term or demand, unsecured notes. The *Humphreys* court has held such notes to be "similar to short term commercial paper which is in widespread use" and, thus, a common security.

### g. Additional Factors

In addition to the above guidelines, the *Humphreys* court also looked at whether the particular persons affected stood in need of the protection of the corporate securities law and the ease with which the indebtedness could have been transferred from the original to subsequent purchasers. The first of these factors, when examined in light of the undisputed portion of the record before us, would lead us to conclude that the CLC trust fund offering was public. As we stated above, the offerees and potential offerees in this case do not appear to have had any uniformly high degree of business sophistication. They were like any general cross-section of the public. Since the securities laws were created to protect the public, as a whole, we see no reason why the offerees in the present case should be excluded from such protection.

The second additional factor, relating to the transferability of the instruments used, would weigh against a public offering conclusion. Nevertheless, when balanced against the overall conclusion which we must draw from the other factors mentioned above, the non-transferability of the CLC trust fund certificates of deposit would not prevent a legal determination that the issuance of the CLC trust fund instruments was a public offering. We conclude, as a matter of law, that such was the case.

### 5. The Issue of Derivative Liability

As an additional assignment of error, the appellants argue that the trial court incorrectly refused to attribute liability to the officers of the CLC. His failure to do so, however, appears to have been based upon his decision that the instruments used were not securities under California law. On remand, we would instruct the trial court to examine this issue in relation to any finding it may make that the CLC is liable to the appellants under the California securities statutes.

### III. CONCLUSION

We conclude that the trial court erred in its determination, on the basis of the record

before it, that no issue of material fact existed as to whether the instruments issued by the CLC trust fund were "securities" and in its finding and conclusion that these instruments were not securities. Inasmuch as its subsequent judgment of dismissal was based upon this incorrect decision, and the orders made consequent to it, we must REVERSE and REMAND that judgment and those orders for additional evidentiary proceedings consistent with our opinion herein. We further conclude that it was an abuse of the trial court's discretion not to permit the plaintiffs to amend their complaint to include the six additional fraud defendants. We, therefore, direct the trial court to approve this amendment.

REVERSED and REMANDED.