(No. 25867.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN TAYLOR WILSON, Plaintiff in Error.

*Opinion filed February 14, 1941.*

MYER H. GLADSTONE, and RUSSELL BAKER, for plaintiff in error.

JOHN E. CASSIDY, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (JOHN T. GALLAGHER, JOHN J. PHILLIPS, and NATHAN KINNALLY, of counsel,) for the People.

Mr. JUSTICE MURPHY delivered the opinion of the court:

Plaintiff in error, John Taylor Wilson, was convicted in the county court of Cook county for a violation of the Illinois Securities act and sentenced to pay a fine of $1000. He was ordered committed to the county jail until the fine and costs were paid. The Appellate Court confirmed the judgment of conviction, (*People* v. *Wilson,* 306 Ill. App. 216,) and the case is here for further review on a writ of error to that court.

The second count of the amended information, upon which plaintiff in error was tried and convicted, charged, in substance, that he was an agent and official of the Chicago Gulf Corporation, the issuer of certain described securities, and that, on September 16, 1937, he unlawfully sold to J. Harold Lahman 41 certificates, described by serial number, which certificates were for 3900 shares of the stock of said corporation. It was alleged the certificates were securities within the meaning of the Illinois Securities act, that they were not registered and were not class "A" or class "B" certificates. The case was tried before the court without a jury.

The grounds for reversal are that the People did not prove plaintiff in error guilty beyond a reasonable doubt and that there was a fatal variance between the allegations

and proof. Under the first point, it is contended the evidence shows that the stock sold was from the personal holdings of plaintiff in error and not the stock of the issuer, and that under sub-paragraph 1 of section 5 of the Illinois Securities act (Ill. Rev. Stat. 1939, chap. 121½, par. 100) the stock sold was class "B" stock and exempt from the registration requirements of the act.

Section 5 provides: "Securities in class 'B' being exempted sales, shall include," then follows sub-paragraphs 1 to 7 inclusive, which specify the character of sales which are to be considered as being in class "B." Sub-paragraph 1 is the only one material in this case and it provides: "The sale in good faith and with no intent to defraud, of any security by or on behalf of a vendor who is not an issuer or underwriter or promoter of the issuer, or a dealer or broker; and who, being a *bona fide* owner of such security, disposes of his own property for his account; provided that such sale is not made directly or indirectly for the benefit of the issuer, promoter or an underwriter of such security, nor for the direct or indirect promotion of any scheme or enterprise of the issuer of such security." The specific question is as to who has the burden of proving that the sale of the stock in question was made under such circumstances as to exempt it under said sub-paragraph 1.

The material parts of the evidence are not in conflict. They show that the Chicago Gulf Corporation, of which plaintiff in error was president, was organized in March, 1930, under the laws of Delaware, for the purpose of establishing and maintaining an oil business with authority to acquire oil rights and to drill and prospect for oil, gas and other minerals and to dispose of any oil products obtained. Its principal property holdings were located in Texas, but it had an office in the city of Chicago. Various amendments were adopted in reference to the issuance of stock, but in August, 1936, the corporation was authorized to

issue 600,000 shares of corporate stock divided into two classes, 500,000 shares of common stock of par value of $1 per share and 100,000 shares of class "A" convertible preferred stock with no par value. In August, 1936, the company was in financial difficulties and plaintiff in error, as president, called a special meeting of the board of directors for the express purpose of considering ways and means of raising money to meet the immediate current liabilities.

A majority of the members of the board of directors was present at the meeting, which was held September 2, 1936, when plaintiff in error presented and read to the meeting the balance sheet of the corporation showing its financial condition as of August 31, 1936. It showed accrued current liabilities of $44,387.33 as against current assets of $5000. The report reflected the future needs and estimated them at $56,286.11. After the board had considered the financial condition, plaintiff in error proposed a plan of raising money which was put in the form of a resolution and adopted. It authorized the issuance to plaintiff in error of 100,000 shares of the common capital stock at $1 per share, for which he was to give his promissory note for $100,000 payable to the company, secured by a pledge of the shares of stock so issued. The resolution provided that plaintiff in error should have the right and privilege to withdraw from the pledge, on his trust receipt, convenient blocks of stock for sale. It also provided "that said John Taylor Wilson shall not sell, exchange or offer for sale said 100,000 shares of the common capital stock of this corporation, all or any part thereof to any person whomsoever, save and except persons, partnerships, association of persons and corporations exempted under the Illinois Securities law, unless and until 100,000 shares of the common capital stock of this corporation is qualified for sale under the Illinois Securities law." Pursuant to the resolution 99,795 shares of the

common stock were issued to plaintiff in error and he executed the promissory note. The stock and note were held by the vice-president of the corporation as custodian.

The evidence discloses that plaintiff in error owned some common stock of the corporation which had been acquired prior to the $100,000 transaction and that October 13, 1937, he received 30,000 shares from the company in consideration of services to the company. A large amount of evidence was taken in endeavoring to trace the stock certificates involved and to determine the transaction from which plaintiff in error acquired them. However, the serial numbers of the stock certificates sold to the complaining witness were issued by the transfer agent of the corporation to plaintiff in error and were a part of the serial numbers included in the $100,000 transaction. The vice-president testified that, from time to time, plaintiff in error withdrew blocks of the stock on his trust receipt. Some of the shares were sold to persons other than the complaining witness. A resolution of the board of directors adopted October 13, 1937, shows that the $100,000 note given for the 100,000 shares of stock was discharged as follows: In part by payment of cash, return of blocks of stock totaling 57,395 shares and the taking of a new note for $24,993.14, secured by 25,025 shares of common stock.

Plaintiff in error contends that the settlement of October 13, 1937, which involved the cancellation of the $100,000 note, the surrender of a part of the certificates of stock included in the 100,000 shares and the giving of a new note, terminated the first transaction and that, thereafter, he held the stock in his own right by virtue of the settlement of October 13 and that it was this stock he delivered to the complaining witness on October 25 following. The evidence shows negotiations for the sale of the stock began in July, 1936, and were completed by delivery of the stock on the date stated.

For the purposes of this case it is not necessary to set forth the provisions of the various sections by which securities are divided into classes or the distinguishing characteristics that form the basis of such classifications. Section 3 (par. 98) of the act declares what shall be included within the term "securities." It is broad and comprehensive, and in view of the other sections of the act it is evident that it was the legislative intent to include all securities within the definition so that they might be given a classification. The section divides securities into six classes and states what shall be the inherent qualities of each class. Section 4 (par. 99) specifies the character of securities that shall constitute class "A." The last paragraph of the section provides that, subject to the provisions of the section and the other provisions of the act, class "A" securities may be sold or offered for sale in this State without the filing of any statement in the office of the Secretary of State. The effect of section 4 is to define class "A" securities and place them beyond the registration requirements. Sections 6, 6a, 6b, 7 and 7a define class "C," investment contracts and investment trusts and direct that such securities shall be registered with the Secretary of State before they may be sold or offered for sale. Section 5 (par. 100) deals with class "B." The thing which characterizes class "B" securities is not the inherent quality of the security but the circumstances under which the security is sold. It prescribes what character of sale will exempt a security from the requirements of the act. In the concluding part of the section it provides: "Except as above provided, securities when disposed of by persons and in the manner provided by this section shall not be subject to the provisions of this act in such transactions." Section 8 (par. 103) provides that all securities other than those falling within classes "A," "B" and "C" and investment contracts, shall be known as securities in class "D."

It will be noted that the effect of the provisions of the several sections referred to is to include all forms of securities and classify them in two groups according to their inherent quality. One group includes those securities which contain qualities that are designated by section 4 as class "A" and these are excluded from the registration requirements of the act. By the other provisions all securities which do not possess class "A" qualifications are required to be registered with the Secretary of State, subject, however, that under section 5 they may be sold under conditions and circumstances specified in the section, which make them class "B" securities, and exempt from registration. It will be observed that class "B" securities is not a classification based upon the inherent quality of the security, as are the other classes designated in the statute, but the essential requirements of a "B" classification are based upon the character of the sale and the circumstances under which the stock is sold.

In a prosecution for selling securities in violation of the registration features of the act, the burden is on the People to prove that the securities sold are of a class that was required to be registered. (*People v. Johnson,* 355 Ill. 380; *People v. Love,* 310 id. 558.) In the present case the People proved, beyond a reasonable doubt, that the securities sold the complaining witness were not class "A" securities. If they were not of the quality for class "A" then it follows that, in regard to their quality, they were either class "C" or class "D." If they were of either class "C" or class "D," it was necessary that they be registered with the Secretary of State before being offered for sale. The certificate of the Secretary of State showed they were not registered. By proof that they were not class "A" and that they had not been registered, the People established its case.

Plaintiff in error contends the burden was on the People to prove that the securities sold were not class "B." From

what has been said, it will be observed that in regard to registration requirements, securities are divided by the act into two groups, namely: Class "A" which are excluded and the other classes, excepting class "B," which are included. Securities in class "B" are sales of securities which are required to be registered but are exempt from registration by means of the circumstances under which they are sold as specified in section 5.

There is a well-established rule in this State that where the subject matter of a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true unless disproved by the other party. (*Kettles* v. *People,* 221 Ill. 221; *Williams* v. *People,* 121 id. 84; 1 Greenleaf on Evidence, sec. 39.) The circumstances of the sale under which plaintiff in error sold the securities are best known to him and under the rule, and in the absence of proof to the contrary, it will be assumed that the allegation in the information that the securities sold were not class "B" is true.

Sub-paragraph 2 of section 37 (par. 132) of the Illinois Securities act provides: "In any action, civil or criminal, where the seller or issuer relies for his defense upon any of the exemptions provided for in this act, the burden of proof to establish such exemption, shall be upon such issuer or seller." This is a legislative pronouncement of what was a rule of law, and exemptions, as used in the section, refer to transactions specified in section 5 which make a security class "B" and exempt from registration. The burden was on plaintiff in error to show that the securities were sold to the complaining witness under such circumstances as to bring the sale within one of the exemptions specified in section 5, thereby making the security of class "B" and exempt from registration. In *People* v. *Johnson, supra,* it was held that it was the duty of the People to prove, beyond a reasonable doubt, that the securities were either class "C" or class "D" securities. It was said this could be done by

direct proof of that fact or by proof that the securities were not in either class "A" or class "B." In so far as that decision holds that the burden was on the People to prove that securities were not class "B," the same is not followed.

Under the views expressed, plaintiff in error's contention that the stock sold was from his private holdings and not a part of the 100,000 shares transaction, could not, if true, give him any aid in this case. In either event, the burden was on him to prove that the sale was in good faith with no intent to defraud and that the sale was not either directly or indirectly for the benefit of the corporation nor for the direct or indirect promotion of any scheme or enterprise of the company. He did not make such proof. In fact, the evidence of the People proves directly the opposite.

The contention that there is a fatal variance between the allegations and proof is not available on review where such point was not urged in the courts below. *People* v. *Ascey,* 304 Ill. 404.

For the reasons assigned, the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*