[Crim. No. 15196. Fourth Dist., Div. One. Apr. 18, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH EARNEST FENO, Defendant and Appellant.

COUNSEL

James C. Krause, under appointment by the Court of Appeal, and Reniche & Krause for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Michael D. Wellington, Jesus Rodriguez and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WIENER, J.—Joseph Earnest Feno appeals from the judgment entered on jury verdicts convicting him of selling securities in violation of the Corporate Securities Law of 1968. (Corp. Code, §§ 25110, 25540.)[1] For the reasons set forth below, we reverse the judgment.

### Factual and Procedural Background

In late 1978 Feno left his employment as a meatcutter and started a used car business. Thinking additional capital would enable him to make more

---

[1] All statutory references are to the Corporations Code unless otherwise specified.

money, he advertised in two local newspapers that he had an excellent investment opportunity. Several people responded. Feno's deal was simple: the investor would give him money so he could purchase used cars at auctions, Feno would then recondition the cars selling them at a profit to be shared with the investor. Each investor had his or her own financial arrangement, but each signed a similar "investor's contract." Although some of the investors knew others also were investing, each investor "owned" specific cars and would make money only when those particular cars were sold. Feno's sales technique included his suggestion the investors could become involved in the business. For example, at his suggestion some of the investors obtained vehicle salespersons' licenses (Veh. Code, §§ 11800, 11802), permitting them to sell "their" cars. As a practical matter they sold no cars and generally refrained from participating in the business. On occasion some offered advice such as pooling their money or hiring a secretary and buying economy cars, but Feno was neither compelled to nor did he always follow that advice. Under the investor's contract each investor had the option of receiving his or her entire investment back upon 90 days' notice.

Feno testified he wanted participation from the investors and some advice and guidance. He acknowledged, however, the investors were relatively uninformed about the used car business, and that his business success did not require professional or managerial skill on their part. Feno conceded any profit expected was solely from his efforts in being able to select and market cars, and the investors had no authority to run the business.

In 1980 Feno's economic bubble burst. Although he was able to return modest amounts of money to the investors, he declared bankruptcy and, with only one exception, paid back none of the original investments.

A jury found Feno guilty of seven counts of selling securities in violation of section 25110. Six different victims were involved. Feno was placed on probation for five years on the condition he pay $51,000 restitution (Pen. Code, § 1203.1), dismiss an action he filed in his bankruptcy proceeding to enjoin further state court prosecution and serve a period of 90 days on work furlough. This appeal ensued.

### Introduction

Before addressing the specific issues Feno raises, we present a brief overview of the pertinent statutory provisions.

Section 25110 declares: "It is unlawful for any person to offer or sell in this state any security in an issuer transaction . . . unless such sale has been qualified under Section 25111, 25112 or 25113 . . . or unless such security

or transaction is exempted under Chapter 1 (commencing with Section 25100) of this part.''

Section 25540 makes it a crime for any person to wilfully violate any provision of the Corporate Securities Law. ■■■ Criminal violations of section 25110 are strict liability offenses. (*People* v. *Clem* (1974) 39 Cal.App.3d 539, 541-543 [114 Cal.Rptr. 359].) The offer or sale of a "security"[2] is a key element of such an offense which the prosecution must prove beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068]; *People* v. *Roder* (1983) 33 Cal.3d 491, 497 [189 Cal.Rptr. 501, 658 P.2d 1302].) By raising a reasonable doubt on the security issue, a defendant is entitled to an acquittal. (Pen. Code, § 1096.)

■■ Even if he concedes the offer or sale of a security, or fails to raise a reasonable doubt on the issue, a defendant may still gain acquittal under section 25110 by showing (1) the sale of the security was qualified, or (2) the security itself was exempt, or (3) the securities transaction was exempt. The defendant has the burden of proving these affirmative defenses. (§ 25163; *People* v. *Skelton* (1980) 109 Cal.App.3d 691, 724 [167 Cal.Rptr. 636], cert. den., 450 U.S. 917 [67 L.Ed.2d 343, 101 S.Ct. 1361]; *People* v. *Park* (1978) 87 Cal.App.3d 550, 566-567 [151 Cal.Rptr. 146].) An exemption thus operates to exclude a security or a securities transaction from the securities regulation provisions that would otherwise apply. (See §§ 25100-25105.)

■■ At the time of Feno's transactions with the investors, former section 25102, subdivision (f) provided an exemption from the provisions of section 25110 for transactions involving nonpublic offerings of certain types of securities: "(f) Any offer or sale, in a transaction not involving any public offering, of any bona fide general partnership, joint venture or limited partnership interest, . . ." (Stats. 1979, ch. 665, § 1.7, p. 2042.)[3] Although

---

[2]Section 25019 provides in part: " 'Security' means any note; stock; treasury stock; membership in an incorporated or unincorporated association; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; any beneficial interest or other security issued in connection with a funded employees' pension, profit sharing, stock bonus, or similar benefit plan; or, in general, any interest or instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the foregoing are securities whether or not evidenced by a written document. . . ."

[3]Effective November 1, 1981, section 25102, subdivision (f) provides a limited offering exemption for the offer or sale of any security in transactions meeting specified statutory criteria. (Stats. 1981, ch. 1120, § 1, pp. 4388-4389; 1 Marsh & Volk, Practice Under the Cal. Securities Laws (rev. ed. 1983) § 4.02A[1][a] (cited hereafter as Marsh & Volk).)

somewhat unclear, this exemption implicitly distinguishes between joint venture interests which are securities (see §§ 25010, 25013) and those which are not. The distinguishing characteristic is whether the interest represents a passive investment or an active participation in the venture on the part of the interest holder. (See *People* v. *Skelton, supra,* 109 Cal.App.3d at pp. 712-713; *People* v. *Park, supra,* 87 Cal.App.3d at pp. 563-564; see also 2 Ballantine & Sterling, Cal. Corporation Laws (1983) § 444.02.) Joint venture interests representing passive investments are securities and therefore are exempt if offered or sold in nonpublic transactions. However, those interests involving active participation in the venture are not securities and thus are outside the scope of the Corporate Securities Law. Such interests can be offered or sold without being qualified or exempted as otherwise required by section 25110.

We admit to some puzzlement over the meaning of the term "bona fide" as included in former section 25102, subdivision (f). If a "bona fide" interest in a joint venture involves active participation in and control of the business (see *People* v. *Park, supra,* 87 Cal.App.3d at pp. 562, 564; see also *Weinstock* v. *L. A. Carpet, Inc.* (1965) 234 Cal.App.2d 809, 813-814, 817 [44 Cal.Rptr. 852]),[4] subdivision (f) becomes internally contradictory because it makes no sense to provide an exemption from securities regulation for an interest which is not a security. On the other hand, if a "bona fide" interest in a joint venture represents a passive investment, then the term "bona fide" seems redundant and unnecessary as stating a given (i.e., a joint venture interest *which is a security* is exempt from securities regulation if offered or sold in a nonpublic transaction). Neither interpretation is appealing in light of the standard canons of statutory construction, since the former is inharmonious and the latter is surplusage. (See *People* v. *Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104].) Regardless of the statutory lack of neatness, given our obligation to adopt the construction more favorable to the defendant (*People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186]), we apply the latter interpretation.

*Discussion*

I

At trial Feno conceded his contracts with the investors were not exempt and their sale was not qualified. Feno also conceded his transactions with

---

[4]To the extent "bona fide" reflects the partnership concept of *delectus personae,* that would be consistent with participation in and control of the venture. (See *Rivlin* v. *Levine* (1961) 195 Cal.App.2d 13, 21-24 [15 Cal.Rptr. 587]; Comment, *Limited Partnerships and the Cal. Securities Law: Restricting the Public Sale of Limited Partnership Interests* (1980) 13 U.C. Davis L.Rev. 618, 643, fn. 142.)

the investors were not exempt, except as to counts 2 and 4 which he argued were nonpublic and thus within the scope of former section 25102, subdivision (f).[5] Thus, except as to counts 2 and 4, the only disputed issue at trial was whether Feno's transactions with the investors involved the sale of a "security" within the meaning of section 25019. (See fn. 2, *ante.*)

To prove this essential element the prosecution presented an "investment contract" theory. ■ Feno countered by characterizing the transactions as either personal services contracts or joint ventures involving active participation and control by the investors. Neither type of arrangement is a security. (*People* v. *Syde* (1951) 37 Cal.2d 765, 768-769 [235 P.2d 601]; see *Osuna* v. *Russell* (1959) 176 Cal.App.2d 110, 112-113 [1 Cal.Rptr. 289]; *Oakley* v. *Rosen* (1946) 76 Cal.App.2d 310, 314-315 [173 P.2d 55]; see also 2 Ballantine & Sterling, Cal. Corporation Laws, *supra*, § 444.02.) Both Feno and the prosecution submitted jury instructions to the court. A considerable portion of the court's and counsel's debate over those instructions concerned the definition of joint venture and the proper relationship between that concept and the security and exemption issues under section 25019 and former section 25102, subdivision (f).

■ As we shall explain, the trial court correctly instructed the jury that Feno had the burden of proving any exemption he claimed, but erred in describing all joint ventures as being "exempt" from securities law regulation. This error, considered together with the prosecutor's incorrect argument that Feno had the burden of proving a "joint venture exemption," and further exacerbated by the court's erroneous failure to instruct on Feno's defense burden of proof, lessened the prosecution's burden of proving the "security" element of the offense beyond a reasonable doubt. We conclude the court's instructional errors were prejudicial and therefore reverse the judgment.

A

In instructing the jury on Feno's and the prosecution's competing theories, the court stated in part: "First of all, it is unlawful for any person to offer or sell in this State any security unless such sales have been qualified or unless such security or transaction is exempted.

" . . . . . . . . . . . . . . . . . . . .

"A joint venture is a special combination of two or more persons wherein

---

[5]Whether the nonpublic transaction exemption may be available for counts 2 and 4 is discussed below in part II A.

some specific venture, a profit is jointly sought without any actual partnership or corporation designation or as an association of persons to carry out a single enterprise for profit for which they combine their property, money, effects, skill and knowledge. [¶] *A bonafide joint venture is exempt from the registration provisions of the corporate security law.* You are instructed that a joint venture or partnership exists when there is an agreement between the parties under which they have a community of interest, a common business undertaking and an understanding as to the sharing of profits and losses and a right of joint control. Without the right of joint participation in the management and control of the business, there is no partnership or joint venture." (Italics added.)

Feno correctly challenges the court's characterization of joint venture as "exempt." As we described above, an exemption operates as an affirmative defense, excluding a security or a securities transaction from the securities regulation provisions that would otherwise apply. By characterizing all joint ventures as "exempt" the court necessarily assumed the joint venture interests described by Feno *were* securities. The court erred in so assuming rather than instructing the jury to decide whether those interests were securities within the meaning of section 25019.

By itself, this mischaracterization appears to be innocuous, a semantic nicety. Based solely on the above instruction, the jury had no reason to consider Feno's joint venture evidence as presenting an affirmative defense rather than an alternative to the prosecution's investment contract theory. Feno, however, raised an exemption defense to counts 2 and 4 under former section 25102, subdivision (f). On this issue the court instructed the jury: "As to Counts 2 and 4, only the defendant has asserted as a defense that the sale was made in an exempt transaction from the securities laws. You should consider this defense only if you have first found that a security was sold. If you find that no security was sold, you should not consider this defense.

"*. . . . . . . . . . . . . . . . . . . . . . . . .*

"As to Counts 2 and 4, in any proceeding under the Corporate Securities Law, *the burden of proving the exemption is upon the person claiming it. In this case if the Defendant claims an exemption, then he has a burden of proving that exemption. The effect of this is to shift the burden of going forward with the evidence to the Defendants.* [¶] It does not, however, remove from the People the burden of establishing every element of the offense by proof beyond a reasonable doubt." (Italics added.)

Even these instructions, correct in themselves, may not have been enough to make the court's earlier erroneous characterization of joint venture prej-

udicial. These instructions were limited to the transactions involved in counts 2 and 4 and the jury may not have concluded from them that Feno had a burden to prove a joint venture. The prosecutor, however, highlighted the court's error and added to the jury's confusion in his closing and rebuttal arguments by dwelling on Feno's burden to prove a "joint venture exemption": "Now, if it is a joint venture, a bonafide joint venture and not just something that somebody decided to call a joint venture for purposes of escaping the consequences of violating the Corporate Securities Law, then they are exempt. And I will explain more to you later about what is and what is not a joint venture. [¶] *And I just want to point this out at this time and tell you that joint ventures are exempt,* and the reason I say that is because even though this is a criminal trial, *if the Defendant is claiming that this is a transaction which even though a security is exempt from the permit requirements, the Defendant bears the burden of proving the fact of that exemption to you,* and he does it by presenting evidence.

" . . . . . . . . . . . . . . . . . . . . .

"You take a look at these instructions, and I would submit to you that the one that says joint venture defined is a bonafide joint venture is exempt from the registration provisions of the Corporate Security Law, period. That's under joint venture defined. [¶] Now, exemptions, whether they are the small offering or as he referred to it as the non-public offerings, *or whether they are joint venture exemptions, are matters that the Defendant is charged with the burden of going forward with the proof. [¶] We would submit to you that the Defendant has failed to do so. He has not proved that it's a joint venture.*" (Italics added.)

Feno objected to the prosecutor's tactic between his closing and rebuttal arguments. The court, however, declined to admonish the prosecutor or to correct the harm of his argument by instructing the jury the exemption at issue was not for joint ventures per se but for nonpublic offerings of joint venture interests, and that Feno had to prove the availability of the non-public transaction exemption *only* if counts 2 and 4 involved the offer or sale of joint venture interests which were securities within the meaning of section 25019.

Feno's joint venture theory was critical to his defense. The jury had a choice. Feno's transactions with the investors either involved investment contracts (i.e., securities) or they involved personal services contracts or joint venture interests which were not securities. ▆▆▆ The burden of proving a security was with the prosecution. Any reasonable doubt as to whether the transactions involved the offer or sale of investment contracts required an acquittal. ▆▆▆ In the context of this case, the court's erro-

neous instruction, combined with the prosecutor's incorrect argument, led the jury to believe Feno's joint venture evidence was relevant *only* to his defense and that Feno had to prove a joint venture in connection with establishing his defense based on the nonpublic transaction exemption. To compound matters, the court erroneously failed to instruct on the burden of proof applicable to Feno's exemption defense.[6] This omission left the jury uninstructed in a context where the only instruction given on burden of proof was that of proof beyond a reasonable doubt. In this confused state the jury may well have incorrectly concluded Feno failed to meet a nonexistent burden of proving he was selling something other than a security. As a result, the jury may have decided the security issue without considering whether Feno's joint venture evidence raised a reasonable doubt regarding the prosecution's investment contract theory, thereby diluting the prosecution's burden of proof on the security issue contrary to the due process clause of the Fourteenth Amendment. (*In re Winship, supra,* 397 U.S. at p. 364 [25 L.Ed.2d at p. 375]; *People* v. *Roder, supra,* 33 Cal.3d at p. 497.) ■ Because the court's instructional errors were of federal constitutional dimension, reversal is required unless the errors were harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)[7]

## B

■ Whether the court's instructional errors were harmless beyond a reasonable doubt presents a close question. Given the choice between the investment contract and joint venture theories, the evidence points strongly to the former. ■ "Under widely accepted judicial interpretation and definition, an investment contract for the purposes of securities laws means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party (*S. E. C.* v. *Howey Co.* (1946) 328 U.S. 293,

---

[6]We conclude below Feno's offering was public as a matter of law and thus the court at retrial should not instruct the jury on the nonpublic transaction exemption provided by former section 25102, subdivision (f). (See part II A, *post.*) Consequently, we need not decide whether the burden of proof applicable to that defense requires a defendant to raise a reasonable doubt on that issue or to establish the exemption by a preponderance of the evidence. (See generally *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 963-968 [127 Cal.Rptr. 135, 544 P.2d 1335]; 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 45.1, pp. 1640, 1643-1645.) Although not discussed by the majority, the dissent devotes parts II, III and IV of its opinion to this issue. Since nothing is said to the contrary, presumably even the dissent agrees this issue should be moot because the challenged transactions, counts 2 and 4, are public as a matter of law.

[7]Feno argues lessening the burden of proof requires reversal per se, citing *People* v. *Burres* (1980) 101 Cal.App.3d 341, 353-354 [161 Cal.Rptr. 593]. (But see *People* v. *Benson* (1982) 130 Cal.App.3d 1000, 1011 [180 Cal.Rptr. 921].) Because we reverse under the *Chapman* standard, we do not address this issue.

298-299 . . .). 'The most essential consistency in the cases which have considered the meaning of "investment contract" is *the emphasis on whether or not the investor has substantial power to affect the success of the enterprise.* When his success requires professional or managerial skill on his part, and he has authority corresponding with his responsibility, his investment is not a security within the meaning of the securities act. *When he is relatively uninformed and unskilled and then turns over his money to others, essentially depending upon their representations and their honesty and skill in managing it, the transaction is an investment contract.*' (Italics added.)" (*People* v. *Park, supra,* 87 Cal.App.3d at p. 563.)

 The facts generally support the impression the investors were unsophisticated in the used car business and were led to expect profits solely or substantially from Feno's efforts. Even he agreed to that at one point in his testimony. However, other facts suggest the investors held and exercised rights of participation in the management and control of Feno's business. For example, the investors had the right to hold the pink slips for their cars and at least one investor did so for some time. Most of the investors intermittently checked on their cars and/or accounts and offered business advice to Feno, some of which he followed. Additionally, some investors obtained car sales licenses. These facts, taken together, may have been sufficient to raise a reasonable doubt regarding whether the parties intended to enter into investment contracts or joint ventures. (See and compare *People* v. *Park, supra,* 87 Cal.App.3d at p. 564; also compare *People* v. *Coster* (1984) 151 Cal.App.3d 1188, 1194-1195 [199 Cal.Rptr. 253].) We are not satisfied beyond a reasonable doubt that the jury would have decided the security issue against Feno had it considered Feno's joint venture evidence as an alternative to the prosecution's investment contract theory. We therefore conclude the court's instructional errors were prejudicial.

## II

For the guidance of the court at retrial, we address the following issues.

### A

As noted above, Feno relied at trial on the nonpublic transaction exemption provided by former section 25102, subdivision (f) as an affirmative defense to counts 2 and 4. Feno conceded the exemption was unavailable for the other counts because they involved transactions initiated in response to his newspaper advertisements. (See *People* v. *Clark* (1963) 215 Cal.App.2d 734, 744 [30 Cal.Rptr. 487], cert. den., 375 U.S. 943 [11 L.Ed.2d 274, 84 S.Ct. 350], rehg. den., 375 U.S. 998 [11 L.Ed.2d 480, 84 S.Ct. 630].)

Count 2 arose from a transaction with Maria Deliberti, a secretary. Deliberti responded to Feno's newspaper advertisements in February 1979, initially investing $5,000 (count 1). Four months later she invested an additional $5,000 (count 2). Count 4 was based on Feno's transaction with William Trepanier, an engineer. Trepanier was a friend of Peter Hamm, another investor recruited by Feno's advertising (count 3). Hamm told Trepanier about the opportunity, which prompted Trepanier to meet with Feno in June 1979 and invest $4,758 (count 4).

Assuming arguendo they involved the sale of "securities" within the meaning of section 25019, Feno argued the transactions involved in counts 2 and 4 were exempt because they were not initiated by advertising. The jury was instructed: "A profit-sharing agreement is exempt from the registration requirements if it is nonpublic.[8] In defining a non-public, private offering and sale, you may consider that an offer or sale of any security[9] does not involve any public offering *if offers are not made to more than 25 persons* and ·sales are not consummated to more than 10 of such persons, and if all of the offerees either have a preexisting personal or business relationship with the offeror, or its partners, officers, directors or controlling persons, or by reason of their business or financial experience could be reasonably assumed to have the capacity to protect their own interest in connection with the transaction." (See Cal. Admin. Code, tit. 10, former § 260.102.2, italics added.)

As the emphasized language makes clear, Feno's exemption argument must fail. Feno advertised his investment opportunity for over a year in two local newspapers with a combined circulation of about 300,000. Under those circumstances, without question, offers were made to more than 25 persons. (See § 25017, subd. (b).) Although each of the transactions in counts 2 and 4 were themselves one step removed from Feno's advertisements, they both occurred in the context of an ongoing offering of the same investment opportunity addressed indiscriminately to a sizable and heterogeneous group (i.e., the readership of the newspapers). Under the above instruction, Feno's offering was public as a matter of law. (Cf. *Tomei* v. *Fairline Feeding Corp.* (1977) 67 Cal.App.3d 394, 401-402 [137 Cal.Rptr. 656] [nonpublic transaction exemption unavailable because, during two-year

---

[8]By characterizing profit-sharing agreements as exempt if nonpublic the court broadened the language of former section 25102, subdivision (f), which referred only to offers or sales of general or limited partnership interests, joint venture interests and beneficial trust interests. Neither party on appeal addresses the effect, if any, of this deviation. We also decline to discuss it because we conclude this instruction will be unavailable to Feno at retrial. (See *post.*)

[9]The court's reference to offers or sales of "any security" also was improperly expansive. (See fn. 8, *ante.*)

period preceding issuer's agreement with investor, issuer entered into same form of agreement with about 100 other people].)

Although not given to the jury, a second set of guidelines was available for determining whether Feno's transactions with the investors involved a "public offering" within the meaning of former section 25102, subdivision (f). These guidelines were based in large part on bulletin No. 67-5 (May 25, 1967) and release No. 5-C (Jan. 31, 1969) issued by the Commissioner of Corporations.[10] As restated in *People* v. *Skelton, supra,* 109 Cal.App.3d at page 724: ■ "The determinative factors indicating a 'public offering' include: (1) the number of offerees; (2) the relationship of the offerees to each other; (3) the relationship between the issuers and the offerees; (4) the size of the offerings; (5) the manner of the offerings; and (6) the character of the security offered. (*People* v. *Humphreys* (1970) 4 Cal.App.3d 693, 697 [84 Cal.Rptr. 496].) In addition, the ease with which the security may be transferred from original purchasers and the fact the particular persons affected needed the protection of the corporate securities law are important considerations. (*Id.,* at pp. 700-701.)"

■ Application of the *Skelton* factors to the evidence produced at trial leads to the same conclusion reached above: Feno's offering was public as a matter of law. The number of offerees here (the readership of the newspapers for over a year) was practically unlimited. We can safely assume there was no close relationship among those offerees based either on blood, friendship or business association. The record discloses none of the offerees who became investors had previously known Feno, and we can safely assume the offeree group as a whole consisted of relative strangers to Feno. As with the number of offerees, the size of Feno's offering was practically unlimited. Feno accepted all investments that came his way, ranging in amount from $4,758 to $20,000. No doubt Feno was prepared to accept as much money as his offerees were prepared to invest.[11] Each of these factors tends to indicate Feno's offering was public. (See *People* v. *Humphreys* (1970) 4 Cal.App.3d 693, 698-699 [84 Cal.Rptr. 496]; release No. 5-C, at 2 Marsh & Volk, *op. cit. supra,* pp. A-4-16 to A-4-20.) In addition, two

---

[10]Bulletin No. 67-5 and release No. 5-C contain identical guidelines. (1 Marsh & Volk, *supra,* § 3.02[2][d].) For the text of release No. 5-C, see 2 Marsh & Volk, *op. cit. supra,* at pages A-4-15 to A-4-21.

[11]One investor, for example, described Feno's ready acceptance of an increased investment:

"Q. [People] Now, did Mr. Feno tell you how much would be required for an investment in his business?

"A. Well, at first he asked for $10,000, but we had 20,000 available and I asked him why not put the whole thing in. If 10 would do good, maybe 20 would still do more good.

"Q. What was his reaction when you told him?

"A. He said that would be just fine."

factors of particular significance here are the manner of Feno's offering and the unsophisticated character of his investors. Feno's use of newspaper advertisements "almost conclusively" established his offering was public (*People* v. *Humphreys, supra,* 4 Cal.App.3d at p. 699), and his investors' general lack of business or financial experience with previous investments demonstrated their need for the protections afforded by the Corporate Securities Law. (See *id.,* at pp. 700-701; see also *Southern Cal. First Nat. Bank* v. *Quincy Cass Associates* (1970) 3 Cal.3d 667, 675-676 [91 Cal.Rptr. 605, 478 P.2d 37]; *Craft* v. *Brooks* (1962) 204 Cal.App.2d 187, 188-189 [22 Cal.Rptr. 68].)

Because Feno's offering was public as a matter of law, the court at retrial should not instruct the jury on the nonpublic transaction exemption provided by former section 25102, subdivision (f).

B

The following comments are germane only if Feno is again convicted.

In this appeal Feno has challenged the validity of the court's order conditioning his probation on dismissal of his bankruptcy action and the payment of $51,000 as restitution.

■ Penal Code section 1203.1 grants trial courts broad discretion to prescribe conditions of probation so long as they serve a purpose specified in the statute. (*People* v. *Richards* (1976) 17 Cal.3d 614, 619 [131 Cal.Rptr. 537, 552 P.2d 97].) ■ Penal Code section 1203.1's major goal is rehabilitation of the criminal. (*Richards, supra,* at p. 620.) Restitution may serve this purpose (see *id.,* at pp. 619-620) and, when properly imposed, may not be discharged in bankruptcy. (*People* v. *Calhoun* (1983) 145 Cal.App.3d 568, 571-572 [193 Cal.Rptr. 394].) ■ Here, apart from its doubtful validity under the supremacy clause (U.S. Const., art. VI, § 2), the court's probation condition requiring Feno to dismiss his bankruptcy action appears unrelated to any of the purposes specified in Penal Code section 1203.1. Moreover, if the condition was meant to ensure Feno's payment of restitution, the condition was unnecessary because of the nondischargeable nature of a proper restitution order. The court may not require dismissal of Feno's bankruptcy action as a probation condition.

As to the amount of restitution, $51,000, the record is unclear whether that sum was actually lost by the investors as a direct result of Feno's conduct. Loss of money is not an element of the crimes of which Feno was convicted. (See *People* v. *Clark, supra,* 215 Cal.App.2d at pp. 736-737, 751 [unlawful sales of securities without permits under former § 26104,

subd. (a)].) ▮▮▮ Although restitution may serve a rehabilitative purpose and may be ordered in cases involving unlawful sales of securities without permits (*People* v. *Sidwell* (1945) 27 Cal.2d 121, 129-130 [162 P.2d 913]; *People* v. *Mason* (1960) 184 Cal.App.2d 182, 187-188 [7 Cal.Rptr. 525]), the amount ordered must be supported by a factual record consistent with a defendant's due process rights. (*People* v. *Richards, supra,* 17 Cal.3d at pp. 620-621.) Accordingly, we presume that if Feno is again ordered to make restitution the total sum and the manner of payment will be consistent with the principles expressed by our Supreme Court in *People* v. *Richards, supra,* 17 Cal.3d 614.

## *Disposition*

Judgment reversed.

Cologne, Acting P. J., concurred.

**STANIFORTH, J.**—I respectfully dissent.

We are mandated by the California Constitution, article VI, section 13, *not* to set aside a judgment "on the ground of misdirection of the jury . . . or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence [we are] of the opinion that the error complained of has resulted in a miscarriage of justice." Reversing the jury verdict here violates this most fundamental of appellate court rules.

The key issue of fact in this case was whether Feno sold securities in violation of the Corporate Securities Law (Corp. Code, §§ 25110, 25540). The evidence is overwhelming—for the most part uncontested—proving beyond any reasonable doubt that Feno is guilty of the crimes as charged.

These facts are: Several unskilled investors, through advertisements and other invitations, were induced to place substantial sums of money in Feno's hands. Feno was to select and purchase vehicles, recondition them and ultimately sell them. These investors depended upon Feno's representations and honesty to manage the business. *These investors had no responsibility beyond turning over their money to Feno.* No investor had any power or authority to affect the success or failure of the business. When viewed in the light most favorable to the People these facts point unerringly to the conclusion the investment contract was a "security" and to the guilt of Feno.

The court correctly instructed the jury as to the definition of a security in accordance with Corporations Code section 25019; the court correctly in-

structed the jury as to the burden of proof placed by law on the People to prove Feno guilty beyond reasonable doubt of selling a security as so defined. There was no ambiguity or misdirection in this imposition on the People of the proper burden of proof.

## I

Feno contends the trial court committed error by refusing his instruction which would have told the jury "It is the burden of the People to prove beyond a reasonable doubt that the relationship between the defendant and every alleged victim was not a personal service contract nor an agency nor a joint venture. If you find the People have not met this burden you shall return a verdict of not guilty for each and every count for which you make a finding."

Feno's proposed instruction is erroneous as a matter of law. The court, after defining a "joint venture" (and "mischaracteriz[ing]" (majority opn., *ante,* p. 728) its legal status as discussed *infra*), instructed as to count 2 and 4 as follows: "The burden of proving an exemption is upon the person claiming it. . . . The effect of this is to shift the burden of going forward with the evidence to Defendants. *It does not however remove from the People the burden of establishing every element of the offense beyond a reasonable doubt.*"

The majority concede these instructions are "correct in themselves" (majority opn., *ante,* pp. 728-729), but insist they create prejudice requiring reversal. These instructions as given are too favorable to the defendant as a matter of law.

Section 25163 of the Corporate Securities Law of 1968 provides: "In any proceeding under this law, *the burden of proving an exemption or an exception from a definition is upon the person claiming it.*" Evidence Code section 500 declares "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." As section 500 suggests, this general rule allocating the burden of proof may be altered as "provided by law." Where any statute (except Pen. Code, § 522) assigns a burden of proof in a criminal matter, "such statute is subject to Penal Code Section 1096"—the ever present presumption of innocence provision. (Evid. Code, § 501.) Thus, in the Corporate Securities Law violation context, the overall burden is and remains on the People to prove a defendant's guilt beyond a reasonable doubt as to all elements of the offense.

## II

Has the burden of proof been "otherwise allocated" by section 25163 in criminal proceedings charging violation of the Corporate Securities Laws where, as here, Feno claims a statutory exemption from liability? In determining whether the traditional allocation of the burden of proof could be constitutionally altered, the courts have considered a number of factors. The first question to be resolved is the role of the facts at issue in the definition of the crime. Does the shifting of the burden of proof instruction concern an essential element of the offense? If it does *not,* it may survive constitutional inspection.

The constitutionality of the burden-shifting rule or device will turn on whether it "undermine[s] the fact finder's responsibility at trial, based on the evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt." (*Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 156 [60 L.Ed.2d 777, 791, 99 S.Ct. 23]; citations omitted.)

In several recent cases the United States Supreme Court has addressed the constitutionality of laws which have shifted the burden of proof on certain issues to a criminal defendant. (See *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450]; *Ulster County Court, supra,* 442 U.S. 140 and *Patterson* v. *New York* (1977) 432 U.S. 197 [53 L.Ed.2d 281, 97 S.Ct. 2319].) In each of these cases, a critical component of the reviewing court's task was to *ascertain whether the facts the defendant claims he was required to prove negated an essential element of the state law offense.* (See *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881], *Patterson* v. *New York, supra,* 432 U.S. at p. 205 [53 L.Ed.2d at p. 288].)

The most recent United States Supreme Court case dealing with the shifting of the burden of proof on a specified issue in a criminal case is *Patterson* v. *New York, supra.* The *Patterson* court examined a New York law requiring a defendant in a second degree murder prosecution to prove by preponderance of the evidence the affirmative defense of an extreme emotional disturbance in order to reduce the crime to manslaughter.

The United States Supreme Court held such a shifting of the burden did not violate the due process clause of the Fourteenth Amendment, reasoning: "We thus decline to adopt *as a constitutional imperative, operating countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused.* Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interest against those of the accused have been left to the legislative branch.

We therefore will not disturb the balance struck in previous cases . . . . Proof of the nonexistence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case . . . ." (*Id.*, at p. 210 [53 L.Ed.2d at p. 292], italics added.)[1] The *Patterson* court pointed out at page 209, footnote 11 [53 L.Ed.2d at p. 291]: "The drafters of the Model Penal Code would, as a matter of policy, place the burden of proving the nonexistence of most affirmative defenses, . . . on the prosecution once the defendant has come forward with some evidence that the defense is present. The drafters recognize the need for flexibility, however, and would, in 'some exceptional situations,' place the burden of persuasion on the accused . . . [¶] [O]ther writers have recognized the need for flexibility in allocating the burden of proof in order to enhance the potential for liberal legislative reforms. See, e.g., Low & Jeffries, [DICTA: Constitutionalizing the Criminal Law?, 29 Va. Law Weekly, No. 18, p. 1. (1977)]."

---

[1]A most perceptive analysis of the impact of burden shifting was set forth by Chief Judge Breitel of the Court of Appeals of New York, concurring in *People* v. *Patterson* (1976) 39 N.Y.2d 288 [383 N.Y.2d Supp. 573, 347 N.E.2d 898], who said: ". . . although one should guard against such *abuses, it may be misguided, out of excess caution, to forestall or discourage the use of affirmative defenses, where a defendant may have the burden of proof but no greater than by a preponderance of the evidence.* In the absence of affirmative defenses the impulse to legislators, especially in periods of concern about the rise of crime, would be to define particular crimes in unqualifiedly general terms, and leave only to sentence the adjustment between offenses of lesser and greater degree. In times when there is also a retrogressive impulse in legislation to restrain courts by mandatory sentences, the evil would be compounded.

"*The affirmative defense, intelligently used, permits the gradation of offenses at the earlier stages of prosecution and certainly at the trial, and thus offers the opportunity to a defendant to allege or prove, if he can, the distinction between the offense charged and the mitigating circumstances which should ameliorate the degree or kind of offense.* . . . The placing of the burden of proof on the defense, with a lower threshold, however, is fair because of defendant's knowledge or access to the evidence other than his own on the issue. To require the prosecution to negative the 'element' of mitigating circumstances is generally unfair, especially since the conclusion that the negative of the circumstances is necessarily a product of definitional and therefore circular reasoning, and is easily avoided by the likely legislative practice mentioned earlier.

"". . . . . . . . . . . . . . . . . . . . . . . .

"*In a more mature and developed criminology sophisticated distinctions should be used freely, guarding only for abuse. The goals are more appropriate definition of and sanctions for crime, and a retreat from primitive notions about crime based on a result alone or based largely on result.* 'A homicide is a homicide is a homicide' is not a truth of modern criminology, *such a simplistic approach, which could be encouraged by making affirmative defenses unattractive to legislators, is not one to be followed.* [¶] . . . *In short, only those with a lack of historical perspective would treat the affirmative defense as a hardening of attitudes in law enforcement rather than as a civilized and sophisticated amelioration.*

"In sum, the appropriate use of affirmative defenses enlarges the ameliorative aspects of a statutory scheme for the punishment of crime, rather than the other way around—a shift from primitive mechanical classifications based on the bare antisocial act and its consequences, rather than on the nature of the offender and the conditions which produce some degree of excuse for his conduct, the mark of an advanced criminology." (At pp. 909-910, italics added.)

## III

The reasoning of the United States Supreme Court has been followed in state courts (and lower federal courts) where corporate securities violations have been charged and a statutory defense of exempt securities been raised. In *State* v. *Goetz* (N.D. 1981) 312 N.W.2d 1, certiorari denied, 455 U.S. 924 [71 L.Ed.2d 467, 102 S.Ct. 1286], the defendant contended the state should be required to prove the nonexistence of an exemption from the corporate securities laws. The jury had been instructed defendant had the burden to prove the existence of an exemption by a preponderance of the evidence. This instruction was based upon North Dakota Civil Code section 10.04-19(1), which provides: " 'In any action civil or criminal, where a defense is based upon the exemption provided for in this chapter, the burden of proving the existence of such exemption shall be on the party raising such defense.' " (312 N.W.2d at p. 9.) Goetz argued the statute unconstitutionally shifted the burden of proof, despite the fact the trial court also instructed the jury the state was required to prove the elements of its case beyond a reasonable doubt. The North Dakota Supreme Court, relying on a Michigan Supreme Court decision, *People* v. *Dempster* (1976) 396 Mich. 700 [242 N.W.2d 381], held the provision was constitutional.

*Dempster* in turn relied upon *United States* v. *Tehan* (6th Cir. 1966) 365 F.2d 191, which upheld as constitutional a provision similar to the North Dakota provision challenged in *Goetz*.

In *Nelson* v. *State* (Okla. Crim. 1960) 355 P.2d 413, it was said whether stock offered or sold falls within the exempt class of securities is a matter peculiarly within the personal knowledge of the seller. Such being the case the state is not required to prove a negative which it is the duty of the seller to ascertain before he sells or offers the security for sale. Under these conditions, the matter of proving a security is exempt is an affirmative defense and the burden is upon the defendant to bring himself within the terms of the exemption claimed under the statute.

To the same effect see *Lamb* v. *Jernigan* (11th Cir. 1982) 683 F.2d 1332, 1335; *State* v. *Goodman* (1974) 110 Ariz. 524 [521 P.2d 611, 613]; *State* v. *Goetz, supra,* 312 N.W.2d 1, 9; *United States* v. *Tehan, supra,* 365 F.2d 191, 195; *People* v. *Wilson* (1941) 375 Ill. 506 [31 N.E.2d 959, 962]; *Commonwealth* v. *David* (1974) 365 Mass. 47 [309 N.E.2d 484, 488-489]; *People* v. *Smith* (1942) 315 Ill.App. 100 [42 N.E.2d 119]; *Commonwealth* v. *Harrison* (1939) 137 Pa.Super. 279 [8 A.2d 733]; *State* v. *Frost* (1979) 57 Ohio St.2d 121 [11 Ohio Ops.3d 394, 387 N.E.2d 235, 238-239].

## IV

California case law is in accord. In *People* v. *Dean* (1933) 131 Cal.App. 228 [21 P.2d 126], the defendant was charged with violating section 18 of the Corporate Securities Act in selling an unauthorized security. Dean claimed the burden was on the state to negative the issuance of such permit. The appellate court held the general rule of evidence respecting the proof of negative affirmance was declared in *Commonwealth* v. *Boyer* (1863) (89 Mass.) 7 Allen 306, where at page 307 it was said: " 'When the defendant is in the first instance shown to have done an act which was unlawful unless he was distinctly authorized to do it, the proof of authority is thrown upon him.' " (*Dean, supra,* at p. 231.) Thus the appellate court in *Dean* held the burden of proving the issuance of the security under a permit was properly placed on the defendant in the criminal proceeding. (*Id.,* at p. 233.)

*Dean* relied upon the much cited case of *People* v. *Boo Doo Hong* (1898) 122 Cal. 606 [55 P. 402], where the defendant was charged with unlawfully practicing medicine without a license. The evidence showed Boo Doo Hong had been practicing medicine in Red Bluff but evidence was not introduced by either side showing or tending to show Boo Doo Hong had or had not a certificate to so practice as required by law. The court instructed the jury the burden was on Boo Doo Hong to establish that he had the certificate. If he failed to prove such fact it must be taken as true that he did not have one. Such instruction was challenged on the ground that in a criminal case the defendant is presumed to be innocent until proven guilty beyond a reasonable doubt and such presumption continues throughout the trial. The Supreme Court responded: "The general rule is undoubtedly as above stated, but there is a well recognized exception to the rule, where there is a negative averment of a fact which is peculiarly within the knowledge of the defendant." (*Id.,* at p. 608.) The *Boo Doo Hong* court upheld the imposition of the burden of proof upon the defendant on this specific issue.

If more than case authority is needed for such a rule, see Fletcher, *Two Kinds of Legal Rules—A Comparative Study of Burden-of-Persuasion Practices in Criminal Cases* (1968) 77 Yale L.J. 880, 909; and 69 Am.Jur.2d, Securities Regulation—State, section 108, page 1138.

The defendant was not asked to negative an element of the offense. He had the burden to persuade the jury as to a statutory exemption. The law most explicitly assigns the "burden of proving an exemption or exception" to Feno, "the person claiming it." (Corp. Code, § 25163.) Feno requested instruction which was not authorized by law. This is no basis for reversal.

V

Feno maintains the trial court committed error by telling the jury a bona fide joint venture is "exempt" from registration provisions of the corporate securities law. The majority opinion concedes that "By itself, this mischaracterization appears to be innocuous, a semantic nicety." (Majority opn., *ante*, p. 728.) A more correct statement of the law under 25012 of the Corporations Code would be that law exempts any "non-public offering of any bona fide general partnership joint venture or limited partnership interest." This misinstruction must be viewed in light of the court's correct definition of a joint venture and as an error that loses any reversible impact where the *People* v. *Watson* (1956) 46 Cal.2d 818, 838 [299 P.2d 243] rule is applied.

VI

In my view, the error in the trial court's instruction was that it does not specify the degree or nature or quantum of burden on the defendant the law requires where a defense of statutory exemption is raised by a defendant. In so doing *the instructions as actually given (and not given) were more favorable to the defendant than those to which he was otherwise entitled.*

The question of a favorable misinstruction (or noninstruction) on this precise issue (exempt security) has not yet been addressed by a California court. However, the Supreme Court of Arizona in *State* v. *Baumann* (1980) 125 Ariz. 404 [610 P.2d 38, 46], was confronted with Arizona Revised Statute section 44-2033, which placed the burden of proving securities were exempt from registration upon the party raising the defense.

In page 46, footnote 8, to its opinion, the Arizona Supreme Court stated: "[T]he jury was not instructed by the trial judge that appellant must carry his burden with respect to proving the exemptions. Instead the jury was instructed that the burden of proof rested wholly with the State. *Any error in the omission of such instruction inured solely to appellant's benefit.*" (*Ibid.*, italics added.)

*In such circumstance the Supreme Court of Arizona affirmed the conviction and sentence despite the failure to instruct.* An earlier case from Arizona, *State* v. *Goodman* (1974) 21 Ariz.App. 252 [517 P.2d 1299], arrived at the same result. The Arizona appellate court there stated: "A.R.S. § 44-2033 states that the burden of proving the existence of any exemption provided for in the statutes shall be upon the party raising the defense. This statute does not eliminate the ultimate burden of proof placed on the State of proving beyond a reasonable doubt the guilt of a defendant. However,

upon proof by the State of violation of the securities law, the burden of going forward with the evidence does shift to the defendant to prove by a preponderance of the evidence the existence of the claimed exemption. See United States v. Tehan, 365 F.2d 191 (6th Cir. 1966)." (*Id.*, at p. 1301, fn. omitted.)

At page 1301, footnote 2, the *Goodman* court stated: "[T]he jury was not instructed by the trial judge that the appellant was faced with a burden of proof with respect to proving the exemption. *Instead, and to appellant's favor, the jury was instructed that the burden of proof rested totally with the State.* No objection was made to the instructions given, nor is any argument made on appeal as to its omission." (Italics added.)

The *Goodman* court found the People had not met their burden of proof and therefore reversed the judgment. In *State* v. *Goodman, supra,* 110 Ariz. 524 [521 P.2d 611], the Arizona Supreme Court vacated the appellate court decision but *affirmed* Goodman's conviction saying: "The defendant did not meet his burden of proof to bring himself within the exemption of A.R.S. §§ 44-18438. See United States v. Tehan, 365 F.2d 191 (6th Cir. 1966)." (*Id.*, at p. 613.)

## VII

The majority opinion here would reverse the judgment and require a costly and lengthy retrial by reason of a failure to instruct or of a misinstruction which, in total effect, was more than favorable to the defendant. The instructions given and argument made did not erroneously shift the burden of proof to the defendant. The ultimate burden was left totally upon the People to prove beyond a reasonable doubt every element of the offense, where, of course, the burden properly belonged.

Error of "innocuous semantic nicety" proportions or overly favorable misinstructions or noninstructions do not equate with a "miscarriage of justice." (Cal. Const., art. VI, § 13.) I would affirm the judgment.

A petition for a rehearing was denied May 4, 1984. Staniforth, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied June 21, 1984. Bird, C. J., was of the opinion that the petition should be granted.